*This opinion is subject to revision before
publication in the Pacific Reporter*

**2016 UT 33**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

GLENN HOWARD GRIFFIN,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20090520
Filed July 27, 2016

On Direct Appeal

First District, Brigham City
The Honorable Ben H. Hadfield
No. 051100219

Attorneys:

Jennifer Gowans Vandenberg, Park City, for appellant

Sean D. Reyes, Att'y Gen., John J. Nielsen, Asst. Att'y Gen.,
Salt Lake City, for appellee

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE PEARCE joined.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1    This thirty-two-year-old murder case is back before us on
appeal for the second time. In 2005, Glenn Howard Griffin was charged
with the 1984 murder of Bradley Perry, who was working at a Texaco
gas station in Perry, Utah. The State sought the death penalty. The jury
convicted Mr. Griffin of murder but imposed a sentence of life without
parole instead of death. When the case was first before us on appeal, we
remanded it to the trial court for a rule 23B hearing addressing three
issues regarding Mr. Griffin's claims of ineffective assistance of

counsel.[1] We stayed the rest of Mr. Griffin's appeal pending the outcome of those proceedings. We now address the trial court's findings from the rule 23B hearing and several of Mr. Griffin's original claims, based on which Mr. Griffin seeks to set aside his conviction. We affirm Mr. Griffin's conviction.

## BACKGROUND

¶ 2    Early in the morning of May 26, 1984, Utah State University students Ali Sabbah and Bassem Barish stopped at a Texaco gas station in Perry, Utah, having left Logan around midnight to drive to Ogden.[2] They were about to put gas in their car when a man came out of the gas station and offered to help them pump the gas, even though the pump was a self-service gas pump. The man was around six feet tall and lean with black eyes and dark hair, as well as a black or dark beard, and was wearing sneakers. As the man was pumping their gas, Mr. Sabbah saw cuts and bruises on the man's hand, and both students noticed that his arms were covered with scratches. Mr. Sabbah also noticed what appeared to be "kind of dried up blood" smeared on the man's shirt or jeans and shiny, fresh blood on the man's sneakers. After the man finished pumping the gas, Mr. Sabbah paid him for the gas with five one-dollar bills.

¶ 3    Mr. Barish then decided that he wanted to buy cigarettes and started to make his way toward the building. The man intercepted him and asked what Mr. Barish was doing. When Mr. Barish answered that he was going to get cigarettes, the man offered to retrieve them from the gas station for him. Mr. Barish asked how much the cigarettes cost, and the man responded that they cost one dollar. The man retrieved the

---

[1] The three issues remanded for the rule 23B hearing were Mr. Griffin's "claims of counsel's conflict of interest, the failure to investigate statements by [Steven] Wells, and the failure to introduce evidence of [Craig] Martinez's burglary of the victim's home." *State v. Griffin*, 2015 UT 18, ¶ 57, ___ P.3d ____.

[2] "When reviewing a jury verdict, we examine the evidence and all reasonable inferences in a light most favorable to the verdict, reciting the facts accordingly. We present conflicting evidence only when necessary to understand issues raised on appeal." *State v. Heaps*, 2000 UT 5, ¶ 2, 999 P.2d 565 (citation omitted).

cigarettes and gave them to Mr. Barish, who gave the man a five-dollar bill. The man gave him four one-dollar bills as change, which Mr. Sabbah believed were from the five dollars that he had given the man for the gas. When the man handed Mr. Barish the cigarettes and his change, Mr. Barish noticed that there appeared to be fresh blood on one of the dollar bills. After this exchange, the students got back in their car and drove away.

¶ 4    This encounter raised the suspicions of both Mr. Sabbah and Mr. Barish. Mr. Barish showed the dollar bill with blood on it to Mr. Sabbah, who also thought it looked like fresh blood. He then placed the bloody dollar bill on the dashboard of the car. The students subsequently sped down the road in an attempt to get pulled over and make contact with the police. After their attempt to get pulled over failed, the students stopped at a pay phone, and Mr. Sabbah called 911. The 911 operator told the students not to leave their location and to wait for an officer to arrive. Approximately ten to thirty minutes later, an officer, who Mr. Sabbah recalled identified himself as Alan, arrived at the students' location. Either Alan or another officer took the four one-dollar bills, including the one with blood on it, from the students and placed them in plastic bags. The students followed the officers to the police station, where the officers took their statements. The students were also interviewed at the police station. During the interview, Mr. Sabbah drew two sketches of the man who pumped the gas, one depicting the man's profile and the other his face.

¶ 5    Police officers arrived at the gas station around 4:30 a.m. When the responding officers entered the building, they saw a blood trail on the floor leading to a storage room. The storage room door was locked, so one of the officers, Officer Joseph Lynn Yeates, climbed up on a structure outside the building to peer into the storage room through a window. Through the window, Officer Yeates saw a man lying on the ground with multiple injuries. After calling for an ambulance, Officer Yeates reentered the store and together with another officer kicked in the storage room door. He then checked the victim's body and determined that the victim was dead. At that point, Officer Yeates canceled the ambulance and called for detectives to respond to the scene. The police vacuumed the "fight area of the crime scene" to collect evidence. During the investigation at the gas station, Officer Dennis Able also recorded and narrated a video of the crime scene.

¶ 6    The victim was identified as Bradley Perry, who worked as a clerk at the gas station. The condition of his body testified to the violent nature of the crime. His hands were tied behind his back with an electrical cord, and he was covered with injuries, including bruises on his shoulders, torso, head, and face. Mr. Perry had what police believed to be a defensive wound on his hand from warding off an attack with a knife, as well as stab wounds on the front of his torso and on his back. Police believed that some of the wounds on Mr. Perry's chest and back were caused by a screwdriver. Mr. Perry also had a head wound that police believed had been inflicted by striking him in the head with a sixty-pound Dr. Pepper syrup container found near his body. Mr. Perry had a fractured jaw and skull. The medical examiner also found injuries consistent with strangulation. Ultimately, the medical examiner determined that Mr. Perry's death was caused by the combination of blunt force injuries to the head and neck and multiple stab wounds.

¶ 7    The state of the storage room and other areas of the gas station showed that there had been a violent struggle. In the arcade area, there were scuff marks on the floor, a large potted plant that had been moved and broken, and there was a smear of blood in the middle of the floor. And in the storage room, there were "spatters and splashes and transfers of blood," "items that had been stepped on and wadded up," and a dental bridge or partial dental bridge that was lying "some distance from the body." Police also found bloody shoeprints from two different kinds of shoes, neither of which matched Mr. Perry's shoes, all around the body and throughout the gas station. About one hundred dollars were missing from the cash register.

¶ 8    Over the years following Mr. Perry's murder, the police had approximately two hundred suspects. *State v. Griffin*, 2015 UT 18, ¶ 8, ___ P.3d ___. The suspects included Thomas Nager, who was an employee at the gas station, and his friend Craig Martinez. One of the students, Mr. Sabbah, identified a picture of Mr. Nager as "consistent" with the man who pumped gas for him and Mr. Barish on the night of the murder. Mr. Nager testified at Mr. Griffin's trial, admitting to selling drugs out of the gas station and stealing money from the gas station. The manager of the gas station also testified that Mr. Nager was late for work on the day of the murder and that he was fired after discovery of the theft. Mr. Nager also testified that he was told by others that Mr. Martinez had "bragged" about committing the murder.

¶ 9    Another suspect who the police investigated was Michael Caldwell, who was recorded claiming that he drove Mr. Martinez and another man to the gas station, where they murdered Mr. Perry. Mr. Caldwell also asserted that he drove the two men to a river where they placed the murder weapon, a knife, "in a plastic bag with some rocks and threw the bag in the river." But upon questioning by the police, Mr. Caldwell's story became inconsistent, and Mr. Caldwell denied having driven Mr. Martinez to the gas station and claimed that he was not serious about the recorded comments. Mr. Nager's, Mr. Martinez's, and Mr. Caldwell's DNA did not match the nuclear DNA blood evidence or the mitochondrial DNA (mtDNA) hair evidence collected from the crime scene. The case went cold.

¶ 10  In June 2005, Mr. Griffin was implicated in the murder when the Utah State Crime Lab checked the nuclear DNA from the blood on the dollar bill against the Utah Combined DNA Index System and discovered that it matched Mr. Griffin's DNA. *Id.* ¶ 9. The match was one in 1.7 trillion. Investigators then tested Mr. Griffin's mtDNA and found that Mr. Griffin could not be excluded as a source of the mtDNA from hairs found in the vacuumings from the crime scene back in 1984. *Id.* According to expert testimony, 99.94 percent of the population could be excluded as donors of the mtDNA, but Mr. Griffin could not be excluded. Additionally, photos showing Mr. Griffin with long hair and a beard bore a "striking similarit[y]" to the sketches Mr. Sabbah drew of the man on the night of the murder. Based on this evidence, the State charged Mr. Griffin with first-degree murder as a capital offense. *Id.* ¶ 10.

¶ 11  At Mr. Griffin's trial, one of the witnesses called by the State was Benjamin Britt, who had previously been incarcerated with Mr. Griffin. Mr. Britt testified that he had overheard several conversations between his cellmate and Mr. Griffin. Mr. Britt specifically testified that he overheard his cellmate and Mr. Griffin discussing "how the blood got onto the dollar bill that was given to a customer" and that Mr. Griffin said "that he couldn't have gotten blood on the dollar bill through an old dried up scratch" and "that he'd been bitten." During Mr. Britt's testimony, Mr. Griffin was represented by Shannon Demler because Mr. Griffin's two attorneys had conflicts of interest with Mr. Britt. Mr. Demler's representation of Mr. Griffin was limited to the cross-examination of Mr. Britt. Mr. Demler had previously represented Frank Archuletta, who had attempted, but failed, to get a deal from the State based on information he allegedly

possessed about Mr. Perry's murder, including the identity of a third perpetrator.[3]

¶ 12 After the trial proceedings concluded, a jury convicted Mr. Griffin for the murder of Mr. Perry. The State sought the death penalty, but the jury chose instead to impose a sentence of life without parole. Mr. Griffin appealed his conviction to the Utah Supreme Court, and we stayed his direct appeal and remanded three issues to the trial court for a rule 23B hearing. *Id.* ¶ 57. The trial court held the rule 23B hearing and issued a final order ruling against Mr. Griffin on all the issues. After that order was issued, the parties filed supplemental briefing on the issues from the rule 23B hearing. We now proceed to address Mr. Griffin's original claims as well as the claims relating to the rule 23B hearing and final order. Because Mr. Griffin's appeal involves a charge of a capital felony, we have jurisdiction under section 78A-3-102(3)(i) of the Utah Code.

**STANDARDS OF REVIEW**

¶ 13 Mr. Griffin's original claims center on the admissibility of nuclear DNA blood evidence and mtDNA hair evidence, the denial of his motions to dismiss, ineffective assistance of counsel, and prosecutorial misconduct. And the claims we remanded for a rule 23B hearing involve allegations of ineffective assistance of counsel.

¶ 14 Two different standards of review apply to Mr. Griffin's claims regarding the admissibility of evidence. The first standard of review, correctness, applies to "the legal questions underlying the admissibility of evidence." *State v. McClellan*, 2009 UT 50, ¶ 17, 216 P.3d 956. The second standard of review, abuse of discretion, applies to the trial court's decision to admit or exclude evidence, *Gorostieta v. Parkinson*, 2000 UT 99, ¶ 14, 17 P.3d 1110; to the "trial court's determination that there was a proper foundation for the admission of evidence," *State v. Torres*, 2003 UT App 114, ¶ 7, 69 P.3d 314; and to the trial court's determination regarding the admissibility of expert testimony, *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). "Under [the

---

[3] Wade Maughan, Mr. Griffin's codefendant, was also implicated in the murder of Mr. Perry. *State v. Maughan*, 2012 UT App 121, ¶ 2, 276 P.3d 1258, *rev'd*, 2013 UT 37, 305 P.3d 1058. The State tried Mr. Griffin first; Mr. Maughan was tried and acquitted in June 2010. *Id.* ¶¶ 3, 5.

abuse of discretion] standard, we will not reverse unless the decision exceeds the limits of reasonability." *Id.*

¶ 15 The standard of review for the trial court's denial of Mr. Griffin's motions to dismiss is correctness. "A trial court's grant or denial of a motion to dismiss is a question of law." *State v. Arave*, 2011 UT 84, ¶ 25, 268 P.3d 163 (internal quotation marks omitted).

> If . . . upon reviewing the evidence and all inferences that can be reasonably drawn from it, the court concludes that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt, [the appellate court] will uphold the denial of a motion to dismiss.

*Id.* ¶ 24 (second alteration in original) (internal quotation marks omitted).

¶ 16 The standard of review for Mr. Griffin's ineffective assistance of counsel claims raised for the first time on appeal is correctness. *State v. Ott*, 2010 UT 1, ¶ 16, 247 P.3d 344 ("An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law." (citation omitted)). For the ineffective assistance of counsel claims that we previously remanded for a rule 23B hearing, "[w]e defer to [the] trial court's findings of fact." *State v. Taylor*, 947 P.2d 681, 685 (Utah 1997).

¶ 17 Finally, the standard of review for Mr. Griffin's unpreserved arguments about prosecutorial misconduct is plain error. *State v. Ross*, 2007 UT 89, ¶ 53, 174 P.3d 628, *abrogated by State v. Bond*, 2015 UT 88, ¶ 44, 361 P.3d 104 (Holding that, contrary to *Ross*, "unpreserved federal constitutional claims are not subject to a heightened review standard but are to be reviewed under our plain error doctrine.").[4] To establish

---

[4] As this is a capital case, Mr. Griffin urges us to exercise our "sua sponte prerogative . . . to notice, consider, and correct manifest and prejudicial error which is not objected to at trial or assigned on appeal, but is palpably apparent on the face of the record." *State v. Tillman*, 750 P.2d 546, 552–53 (Utah 1987). However, this prerogative is limited to capital cases where the death penalty was imposed. The concerns we have in cases where the death penalty was imposed are more serious

(cont.)

plain error, Mr. Griffin must show that "(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *Id.* ¶ 17 (citation omitted).

## ANALYSIS

¶ 18  We analyze three claims dealing with the nuclear DNA blood evidence, several claims dealing with the mtDNA hair evidence, and the claim that Mr. Demler had an actual conflict of interest with Mr. Griffin. We hold that admitting the nuclear DNA blood evidence was not an abuse of discretion and that the foundational evidence for it violated neither the rules of evidence nor Mr. Griffin's constitutional rights. The admission of the mtDNA hair evidence was likewise not an abuse of discretion. Furthermore, expert testimony about the mtDNA hair evidence did not violate the rules of evidence, the mtDNA hair evidence was not unfairly prejudicial, the trial court did not err when it denied Mr. Griffin's motions to dismiss, and the ineffective assistance of counsel claims do not satisfy the *Strickland* test. Finally, we hold that Mr. Griffin did not establish that Mr. Demler had an actual conflict of interest.

¶ 19 Because we hold that the trial court did not abuse its discretion in admitting the nuclear DNA blood evidence and mtDNA hair evidence, it is unnecessary for us to evaluate the rest of

---

than in cases such as the one before us, where the death penalty was an option but ultimately was not imposed. *See id.*; *see also Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). Once the jury decides not to impose the death penalty, the case here, the defendant never again faces the possibility of imposition of that "serious and permanent" penalty in that case. *Tillman*, 750 P.2d at 552. As a result, defendants in such cases must show that the issue was properly preserved below or plead an exception to the preservation rules under plain error, ineffective assistance of counsel, or exceptional circumstances if they want us to consider the issue for the first time on appeal. *See State v. Low*, 2008 UT 58, ¶ 19, 192 P.3d 867.

Mr. Griffin's claims.[5]  Even if we assume that the rest of the claims establish error, such errors would be harmless because there would not be a reasonable likelihood of a different outcome. *See State v. Collins*, 2014 UT 61, ¶ 44, 342 P.3d 789 ("A harmless error is one 'that is sufficiently inconsequential that there is no reasonable likelihood that it affected the outcome of the proceedings.'" (citation omitted)). The presence of Mr. Griffin's nuclear DNA in the blood on the dollar bill and the fact that Mr. Griffin could not be excluded as a donor of the mtDNA from the hairs constitute overwhelming evidence implicating Mr. Griffin in the murder of Mr. Perry. Since that evidence was properly admitted, there was ample evidence for the jury to convict Mr. Griffin, finding him guilty beyond a reasonable doubt. Therefore, any errors that might be established by the remaining claims would not have overcome the DNA evidence against Mr. Griffin and thus would not have made any difference in the ultimate verdict reached by the jury.

¶ 20  Mr. Griffin also claims that inadequate compensation for his counsel "was a total denial of [his] state rights to counsel and due process" and "a total denial of [his] Sixth Amendment right to counsel and his Fifth Amendment right to due process." Mr. Griffin acknowledges that these claims were unpreserved below but argues that he may raise them for the first time on appeal. We disagree. To raise a claim for the first time on appeal, a party must demonstrate that one of the exceptions to our preservation rules apply. *See State v. Houston*, 2015 UT 40, ¶ 13, 353 P.3d 55 ("'As a general rule, claims not raised before the trial court may not be raised on appeal' unless a plain error occurred, exceptional circumstances warrant our review, or the defendant's attorney rendered ineffective assistance of counsel." (footnotes omitted)). Indeed, at least one other jurisdiction has specifically recognized the need to preserve a claim that inadequate

---

[5] Mr. Griffin alleges that Mr. Demler had an actual conflict of interest, which violated Mr. Griffin's rights under the Sixth Amendment. We cannot say that such an error would have been harmless, because "[o]nce a defendant demonstrates an actual conflict, there is no need to show prejudice." *State v. Taylor*, 947 P.2d 681, 686 (Utah 1997) (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980)). Therefore, we must examine whether Mr. Demler had an actual conflict of interest with Mr. Griffin in order to determine whether the trial court made an error which resulted in a presumption of prejudice to Mr. Griffin.

compensation resulted in a constructive denial of counsel. *In re Guardianship of Joei R.*, 756 N.Y.S.2d 516, 518 (N.Y. App. Div. 2003) ("Respondent mother's appellate claim that she was constructively denied effective assistance of counsel by reason of the allegedly constitutionally inadequate compensation available to her assigned counsel, is unpreserved for our review . . . .").

¶ 21 Mr. Griffin does not argue that these claims fall under one of the three recognized exceptions to our preservation rule but instead cites *Taylor v. State*, 2007 UT 12, ¶ 122, 156 P.3d 739, for his proposition that "[a] claim that counsel was denied at a critical stage may be raised first on appeal." However, *Taylor* is an "unusual circumstances" case that deals with a "common law exception that may . . . lift the procedural bar to post-conviction relief." *Peterson v. Kennard*, 2008 UT 90, ¶ 18, 201 P.3d 956. Traditionally, the unusual circumstances exception applies only "when the petitioner has not first sought relief by direct appeal" and is available only in postconviction relief cases. *Lucero v. Kennard*, 2004 UT App 94, ¶ 13, 89 P.3d 175; *see Taylor*, 2007 UT 12, ¶ 1. Mr. Griffin's case, however, is a direct appeal and is not a postconviction relief case. Regardless, it is unclear whether the common law unusual circumstances exception still exists after the 2008 amendments to the Post-Conviction Remedies Act (PCRA). *See Winward v. State*, 2012 UT 85, ¶¶ 14, 19, 293 P.3d 259 (declining to address whether the court's "constitutional authority to recognize" "common law exceptions to the PCRA's procedural bars" still exists after the 2008 PCRA amendments); *Carter v. State*, 2012 UT 69, ¶ 31, 289 P.3d 542 ("Finally, we reiterate that the 2008 PCRA amendments eliminated the *Hurst* common law exceptions . . . ."); *State v. Taufui*, 2015 UT App 118, ¶ 14, 350 P.3d 631 ("Reliance on the 'unusual circumstances' . . . exception[] is also premature because [this] remed[y], if [it] survived the 2008 amendments to the Post-Conviction Remedies Act, [is] only available to a defendant when he or she is 'otherwise ineligible to receive postconviction relief.'" (citation omitted)); *State v. Mardoniz-Rosado*, 2014 UT App 128, ¶ 14 n.8, 328 P.3d 864 ("Because [the defendant] has raised his common law arguments prematurely, we need not address whether the 2008 amendments to the PCRA . . . have subsumed the powers [of the court to apply the unusual circumstances exception to the procedural bar rules] . . . ."). Thus, the unusual circumstances exception in *Taylor* does not apply to Mr. Griffin, and even if it did, it is unclear whether that exception still exists.

¶ 22 Therefore, Mr. Griffin must demonstrate plain error or exceptional circumstances, or that his counsel was ineffective, in order to raise his claims for the first time on appeal. Mr. Griffin does not argue in his briefing that plain error or exceptional circumstances apply. He does cite *Parsons v. Barnes*, 871 P.2d 516, 523 (Utah 1994), and *State v. Templin*, 805 P.2d 182, 186 n.20 (Utah 1990), as support for his assertion that "[a] claim that counsel was denied at a critical stage may be raised first on appeal." Both cases deal with ineffective assistance of counsel claims—a recognized exception to our preservation requirements. But Mr. Griffin openly rejects the characterization of his "Sixth Amendment claim[] of structural error and constructive denial" as an ineffective assistance of counsel claim. We will not characterize Mr. Griffin's Sixth Amendment claim as an ineffective assistance of counsel claim in order to allow us to address it, especially when he specifically argues against such a characterization. Even if we were to analyze the rest of Mr. Griffin's claims as ineffective assistance of counsel claims, Mr. Griffin would still need to meet the first prong of the *Strickland* test by showing "that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment." *State v. Griffin*, 2015 UT 18, ¶ 15, ___ P.3d ___ (internal quotation marks omitted). Mr. Griffin does not even attempt to meet the *Strickland* test for these claims in his brief, and he wholly fails to address these claims in the *Strickland* context at all. As a result, we determine that these claims are inadequately briefed, and we decline to address them.

## I. NUCLEAR DNA BLOOD EVIDENCE

¶ 23 We first analyze Mr. Griffin's claims dealing with the use of the nuclear DNA blood evidence. We hold that Mr. Griffin's challenges to the chain of custody fail and that the admission of the nuclear DNA blood evidence was therefore not an abuse of discretion. We also conclude that the foundational evidence for the nuclear DNA blood evidence violated neither the rules of evidence nor Mr. Griffin's Sixth Amendment confrontation clause rights.

### A. Chain of Custody

¶ 24 We first address Mr. Griffin's challenges to the chain of custody for the nuclear DNA blood evidence collected from the bloody dollar bill. Mr. Griffin argues that "the trial court's factual finding that the nuclear DNA evidence [from the dollar bill] was sufficiently authenticated is clearly erroneous," and "[a]bsent authentication

evidence is inadmissible." As a result, he claims that "the trial court abused its discretion" in admitting the evidence.

¶ 25  In contrast, the State argues that Mr. Griffin did not meet his "burden to rebut a presumption of regularity and affirmatively prove tampering" with the nuclear DNA blood evidence. Furthermore, the State asserts that chain of custody issues go to the evidence's "weight, not its admissibility," and that it is up to the jury, not the trial court, to weigh the evidence when it considers chain of custody. Regardless, the State maintains that it properly "accounted for the dollar bill . . . from the time police gathered [it] in 1984 to when [it was] tested [in] 2005." As a result, the State insists that the trial court did not abuse its discretion when it admitted the nuclear DNA blood evidence because the State accounted for the evidence "from the time police [collected it] in 1984 to when [it was] tested." We agree with the State.

¶ 26 The relationship between evidence's admissibility and the chain of custody for that evidence is laid out in *State v. Bradshaw*, 680 P.2d 1036, 1039 (Utah 1984):

> Before real evidence can be admitted, the trial court must be convinced that the proposed exhibit is in substantially the same condition when introduced into evidence as it was when the crime was committed. Where the evidence has passed through several hands, circumstances surrounding chain of possession are relevant in making this assessment. However, the party proffering the exhibit is not required to eliminate every conceivable possibility that the evidence may have been altered. Some jurisdictions have held that where no evidence has been offered to suggest tampering, proffered evidence is admissible if the chain of evidence is otherwise adequately established.

(citations omitted). Like the other jurisdictions mentioned in *Bradshaw*, Utah courts have held that evidence with a sufficient chain of custody may be admitted when no evidence suggesting tampering has been presented. *See, e.g., State v. Wynia*, 754 P.2d 667, 671 (Utah Ct. App. 1988) ("Once the evidence is in the hands of the state, it is generally presumed that the exhibits were handled with regularity, absent an affirmative showing of bad faith or actual tampering."). Therefore, "[a] weak link in the chain and any doubt created by it go to the weight to

be given the evidence once the trial court has exercised the discretion to conclude that in reasonable probability the proffered evidence has not been changed in any important respect." *Bradshaw*, 680 P.2d at 1039. Here, the trial court found "that there is sufficient evidence that the chain of custody has been established for the admission of both the nuclear DNA blood evidence and the [mtDNA] hair evidence," and "that both the blood on the dollar bill and the hairs in question are the blood and hairs, which were in the possession of witnesses or located at the crime scene in 1984, respectively, and that said items are what the State claims them to be." As a result, the trial court admitted the nuclear DNA blood evidence to be considered and weighed by the jury. We review this decision by the trial court for an abuse of discretion.

1. The Chain of Custody

¶ 27 The chain of custody for the nuclear DNA blood evidence was established at trial as follows. The trial court found that the students, Mr. Sabbah and Mr. Barish, "received four one-dollar bills and a cigarette package from the [Texaco gas] station in question in the early-morning hours of 26 May 1984." Detective Alan Beard, who is now deceased, received four one-dollar bills and a cigarette package from Mr. Sabbah and Mr. Barish early in the morning on May 26, 1984. Detective Beard checked the dollar bills and cigarette package into evidence. These facts were established by Detective Beard's field notes. The requisite foundation for admission of the field notes was laid by Officer Yeates (now Sherriff Yeates), who testified that the "field notes were made by Detective Beard" and that the "notes have been maintained since 1984 as a part of the records of the Box Elder County Sheriff's Office," and by Sheriff Yeates, who "recognized and authenticated" the handwriting on the field notes as that of Detective Beard.

¶ 28 The State also submitted an Evidence Receipt and Property Report, a form designed and used by the Utah State Crime Lab, to authenticate the nuclear DNA blood evidence and establish an unbroken chain of custody. Detective Bruce King, who is now deceased, removed the dollar bills from the Box Elder County Sheriff's Office on May 26, 1984, and submitted them to the Utah State Crime Lab for analysis. Detective King signed the crime lab's Evidence Receipt and Property Report for the dollar bills, and his handwriting was authenticated by the State's witness, Darla King, who is Detective King's widow. The Evidence Receipt and Property Report was also signed by the State's witness, Scott Pratt, who was a criminalist

employed by the Utah State Crime Lab in 1984. Mr. Pratt testified that "he received the material directly from Detective King in 1984 and [that he] signed the Evidence Receipt and Property Report indicating his receipt of the [dollar bills]." This Evidence Receipt and Property Report was further authenticated by the State's witness, Jay Henry, director of the Utah Crime Lab. Mr. Henry testified that the Evidence Receipt and Property Report was made contemporaneously with the crime lab's receipt of the dollar bills for testing. Based on this evidence, the trial court found that "[t]he Evidence Receipt and Property Report has been maintained since 1984 as a part of the records of the Utah State Crime Lab."

¶ 29  After receiving the dollar bills from Detective King, the crime lab cut out "the portion of the dollar bill which contained the smeared and bloody print." The crime lab continuously maintained the cutting of the dollar bill containing the bloody fingerprint "in its evidence freezer from 1984 through 2005, when [the cutting] was subjected to nuclear DNA testing by the Crime Lab." On October 12, 2007, the crime lab returned the remainder of the cutting to Detective Doug Spencer of the Box Elder County Sheriff's Office.

2. Challenges to the Chain of Custody

¶ 30  At trial, Mr. Griffin objected to the admission of the nuclear DNA blood evidence, arguing that there were missing links in the chain of custody, which undermined the finding that the dollar bills were what the State claimed. The missing links, Mr. Griffin argued, came from the inability of the State to account for the dollar bill from the time Mr. Barish placed the dollar bill on the dashboard until it was collected by "some unknown officer." In addition, Mr. Griffin argued that the State did not prove that the dollar bill had not been contaminated. Mr. Griffin also argued that there was an "inference that the [dollar bills were] not what the State claim[ed]" because of his claim that evidence shows contamination of the mtDNA hair evidence. *See infra* ¶¶ 44–45. As a result, on appeal, Mr. Griffin asserts that the trial court "clearly err[ed]" when it admitted the nuclear DNA blood evidence.

¶ 31  Mr. Griffin's contention that the State's burden was to prove conclusively that the dollar bills had not been contaminated is incorrect. The State's burden was to present evidence authenticating the dollar bill sufficiently that the trial court was satisfied that it was what the State claimed. UTAH R. EVID. 901(a). Mr. Griffin had the burden, once it

was established that the dollar bill was in the State's possession, to affirmatively prove actual tampering with the dollar bill or bad faith on the part of the State in order to overcome the presumption that the evidence was handled with regularity. *See State v. Eagle Book, Inc.*, 583 P.2d 73, 75 (Utah 1978). Mr. Griffin has drawn attention to what the trial court conceded were "weak links" in the chain of custody regarding Detective Beard's and Detective King's actions, but pointing out such "weak links" does not rise to the level of proving actual tampering or bad faith and is thus insufficient to overcome the presumption that the State handled the nuclear DNA blood evidence with regularity.

¶ 32 Indeed, given the evidence presented by the State, the trial court did not find that there were any missing links in the chain of custody. Rather, the trial court was satisfied that "there [was] sufficient evidence to establish that the blood originally observed on the dollar bills by [Mr. Sabbah and Mr. Barish] in 1984, [was] the blood which was tested by the [c]rime [l]ab in 2005" and "that said items are what the State claims them to be, and therefore such evidence may be submitted to the jury for the jury to weigh and consider as the jury may deem appropriate." And as the trial court properly stated, Mr. Griffin's counsel could attack the weight of the evidence using the "weak links" in the chain of custody when presenting to the jury. This is consistent with our established caselaw's "two-tiered analysis," in which the trial court decides whether the evidence was altered and, if the trial court determines that the evidence was not altered, "the jury [then] weigh[s] the evidence based on its assessment of the showing of chain of custody." *Id.* In its discretion, the trial court decided that the nuclear DNA blood evidence was not "tampered with" and admitted it into evidence. *Id.* Then, the trial court instructed counsel that it would be left "up to the jury to weigh the evidence based on its assessment of the showing of chain of custody," the weight of which counsel was permitted to attack at trial. *Id.* Given the evidence presented to the trial court by the State, we hold that the trial court did not abuse its discretion when it admitted the nuclear DNA blood evidence.

*B. Hearsay*

¶ 33 The second issue we address regarding the nuclear DNA blood evidence is whether the trial court's use of Detective Beard's notes to establish a foundation for the admission of the nuclear DNA blood evidence violated the rules of evidence. Under rule 104(a), "[t]he court must decide any preliminary question about whether . . .

evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." UTAH R. EVID. Because the rules of evidence do not apply to evidence used to establish a foundation for the admission of other evidence, as was the case with the notes, Mr. Griffin's objection on hearsay grounds fails.

¶ 34　The trial court's consideration of the notes to authenticate the nuclear DNA blood evidence did not violate the rules of evidence. The trial court received the notes when it considered the preliminary question of whether the nuclear DNA blood evidence was properly authenticated "to support a finding that [the dollar bills and the hairs] [were] what the [State] claim[ed]." *Id.* 901(a). Because the trial court was determining this preliminary question, it is clear from the record that it could have based its ruling on rule 104, which states that evidence rules, except those on privilege, do not apply when deciding the preliminary question about admissibility. We may "affirm a [trial] court's ruling on any legal ground or theory apparent on the record." *Insight Assets, Inc. v. Farias*, 2013 UT 47, ¶ 7, 321 P.3d 1021 (internal quotation marks omitted). Because the trial court used the notes in determining the preliminary question of whether the State's nuclear DNA blood "evidence [was] admissible," the trial court was not bound by the rules of evidence regarding hearsay. *See* UTAH R. EVID. 104(a). As a result, Mr. Griffin's objection to the notes on hearsay grounds is misplaced and we reject it.

*C. Sixth Amendment Confrontation Clause*

¶ 35　The third issue we address regarding the nuclear DNA blood evidence likewise relates to the trial court's use of Detective Beard's notes to establish a foundation for the admission of the nuclear DNA blood evidence: Mr. Griffin claims that the use of the notes violated his rights under the confrontation clause of the Sixth Amendment. However, the Sixth Amendment confrontation clause right does not apply to nontestimonial hearsay, such as the notes at issue here. Thus, the notes did not violate Mr. Griffin's Sixth Amendment rights under the confrontation clause.

¶ 36　Mr. Griffin argues that the notes violated his rights under the confrontation clause of the Sixth Amendment because Detective Beard, now deceased, was unavailable to testify and thus Mr. Griffin had no opportunity to cross-examine him. But the United States Supreme Court has recognized "that not all hearsay implicates the Sixth

Amendment's core concerns," which involve "out-of-court statements" that bear "'witness[]' against the accused" and "those who 'bear testimony.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004). "[N]ontestimonial hearsay can be admitted under generally accepted exceptions to the hearsay rule without running afoul of the Sixth Amendment." *Salt Lake City v. George*, 2008 UT App 257, ¶ 8, 189 P.3d 1284 (citation omitted). While "*Crawford* did not provide a comprehensive definition of 'testimonial' . . . , it did give some guidance in determining whether a statement is testimonial." *Id.* ¶ 10. The three "core" formulations of testimonial statements include

> [(1)] *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . ; [(2)] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . ; [and (3)] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Crawford*, 541 U.S. at 51–52 (fourth alteration in original) (internal quotation marks omitted). Certain statements qualify as testimonial under any formulation, including "[s]tatements taken by police officers in the course of interrogations" and "*ex parte* testimony at a preliminary hearing." *Id.* at 52.

¶ 37 The notes of Detective Beard, at issue in this case, do not qualify as testimonial under any of the *Crawford* formulations. They "are regular observations of Detective Beard and are not accusatory or matters of judgment or credibility but merely notes reflecting the performance of ministerial duties." As Sheriff Yeates testified, the "notes were made by Detective Beard in the ordinary course and scope of his duties, pursuant to a legal obligation to document the source of [the dollar bills and cigarettes]." The trial court found that "[the notes] certainly weren't designed to convict Mr. Griffin. [The police] had no idea who [Mr. Griffin] was then. [The notes] were simply designed to document what [the police] were doing with that evidence." Thus, the notes were "not prepared to be used to convict a particular defendant of a crime," nor were they "accusatory as against any particular

defendant," including Mr. Griffin. *George*, 2008 UT App 257, ¶ 13. "As such, we conclude that the [notes] are not testimonial in nature in the manner with which *Crawford* was concerned." *Id.* Because the notes are not testimonial, they did not implicate Mr. Griffin's rights under the confrontation clause of the Sixth Amendment.

## II. mtDNA HAIR EVIDENCE

¶ 38  Next, we analyze several of Mr. Griffin's claims dealing with the use of mtDNA hair evidence in this case. We hold that Mr. Griffin's challenges to the chain of custody fail and that the admission of the mtDNA hair evidence was not an abuse of discretion. Expert testimony about the statistical significance of Mr. Griffin's mtDNA did not violate the rules of evidence, and the mtDNA hair evidence was not unfairly prejudicial under rule 403. The trial court did not err when it denied Mr. Griffin's motions to dismiss based on allegations that the mtDNA hair evidence was contaminated. And Mr. Griffin's claims of ineffective assistance of counsel in the context of the mtDNA hair evidence do not meet the requirements of the *Strickland* test.

### A. Chain of Custody

¶ 39 The first issue we address regarding the mtDNA hair evidence is Mr. Griffin's challenge to the chain of custody. Mr. Griffin argues that "there is no chain to prove [the mtDNA hair evidence's] authenticity," and thus that evidence was inadmissible. Furthermore, Mr. Griffin argues that "[t]he State admitted contamination [of the hair evidence] was possible and the trial court found that the State failed to show [contamination] was improbable." As a result, he claims that "the trial court abused its discretion in admitting this evidence."

¶ 40  In contrast, the State argues that Mr. Griffin did not meet his "burden to rebut a presumption of regularity and affirmatively prove tampering" with the mtDNA hair evidence. Furthermore, the State asserts that chain of custody issues go to the evidence's "weight, not its admissibility," and it is up to the jury, not the trial court, to weigh the evidence when it considers chain of custody. Regardless, the State maintains that it properly "accounted for . . . the hairs from the time police gathered them in 1984 to when they were tested between 2005 and 2007." As a result, the State insists that the trial court did not abuse its discretion when it admitted the evidence, because Mr. Griffin "showed at best only the possibility of tampering, which is not enough to overcome the presumption of regularity," and because the trial court

permitted the jury to weigh the evidence based on Mr. Griffin's contentions regarding the chain of custody.

¶ 41   Once again, we agree with the State. The trial court did not abuse its discretion by admitting the mtDNA hair evidence, because Mr. Griffin did not meet his burden to affirmatively prove that the mtDNA hair evidence had actually been tampered with, and the trial court permitted the jury to weigh the evidence based on the State's and Mr. Griffin's evidence contesting chain of custody. The same test that we laid out above, *supra* ¶ 26, for determining whether evidence is admissible based on its chain of custody also applies to the admission of the mtDNA hair evidence.

1. The Chain of Custody

¶ 42   The chain of custody for the mtDNA hair evidence was established at trial as follows. The State presented a crime scene video that Detective Able had recorded and narrated on May 26, 1984, and which, the trial court found, "showed hairs in the fight area of the station on the morning following the murder of [Mr.] Perry." Testimony and records submitted by the State "indicate[d] that vacuuming was conducted in the fight area of the crime scene." The Evidence Receipt and Property Report referenced above listed the vacuumings from the crime scene and the victim's clothing. *See supra* ¶ 28. The records of crime lab analyst, Martha Kerr, unavailable for trial, show that she separated "twenty-five . . . hairs from the vacuumings and clothing" listed on the Evidence Receipt and Property Report. The trial court received some of Ms. Kerr's handwritten notes "made at or near the time of her analysis" of the hairs, which took place "in late May and early June 1984." Mr. Henry, who authenticated the Evidence Receipt and Property Report, "recognized and authenticated Ms. Kerr's handwriting." As a result, the trial court found that the hair evidence in the vacuumings and on the victim's clothing was received by the Utah State Crime Lab on May 26, 1984, and was maintained continuously from 1984 through November 2006.

¶ 43   The crime lab released some of the hairs to Detective Spencer in November 2006 and February 2007. Each time, "Detective Spencer immediately mailed said hairs to Mitotyping Technologies, Inc., a [mtDNA] analysis company, in State College, Pennsylvania."[6]

---

[6] We discuss Mr. Griffin's contention that there was a one-day delay
(cont.)

Mitotyping Technologies tested the hairs it received in November 2006 and February 2007. The tests indicated that some "hairs belong[ed] to the same type as those of [Mr. Griffin]" and others "belong[ed] to the same type as those of the victim." Afterwards, Mitotyping Technologies returned the pieces of the hairs that were not consumed during testing to Detective Spencer, and the hairs were placed into evidence with the Box Elder County Sheriff's Office. Currently, Box Elder County Sheriff's Office retains possession of "all of the hairs from the vacuuming of the fight area of the crime scene and [the] victim's clothing originally submitted to the [Utah] State Crime Lab on 26 May 1984."

2. Challenges to the Chain of Custody

¶ 44  Mr. Griffin challenges the trial court's finding that the State submitted "sufficient evidence to establish that the hairs, which were vacuumed or located on the victim's clothing and submitted to the [c]rime [l]ab in 1984, included the hairs which were matched to [Mr. Griffin] by Mitotyping Technologies in 2006 and 2007." Mr. Griffin argues that "[b]ecause hair is not unique and is 'susceptible to alteration by tampering or contamination[,]' its proponent must establish it is 'substantially in the same condition' as when it was collected." He further contends that because there was "the possibility of contamination," the hair evidence is not admissible. But the trial court determined, in its discretion, that the State did establish that the mtDNA hair evidence was in "substantially the same condition" as when it was collected. Mr. Griffin's assertion that the State failed to meet its evidentiary burden because there was "the possibility of contamination" does not meet Mr. Griffin's burden to overcome the "presum[ption] that the [mtDNA hair evidence was] handled with regularity." *State v. Eagle Book, Inc.*, 583 P.2d 73, 75 (Utah 1978). The State was "not required to eliminate every conceivable possibility that the evidence may have been altered." *State v. Bradshaw*, 680 P.2d 1036, 1039 (Utah 1984).

¶ 45  At trial, Mr. Griffin asserted that the fact that the Evidence Receipt and Property Report did not list hairs in the vacuumings showed a missing link in the chain of custody. However, the trial court found that the State authenticated the hairs through the notes of

_____

between Detective Spencer receiving the hair evidence and his mailing of that evidence below at ¶ 59.

Ms. Kerr, an analyst who recorded that she collected hairs from the vacuumings and the victim's clothing (which were listed on the Evidence Receipt and Property Report), and those notes were authenticated by Mr. Henry. Mr. Griffin also objected to the vague description of the "fight area" vacuumed in the gas station as well as the lack of information concerning the state of the vacuum itself, since no evidence identified the vacuum or indicated whether it had been cleaned before being used to collect evidence at the gas station. He further argued that because the videographer, Officer Able, was not wearing gloves or a hair net, this gave rise to an inference that the evidence was collected improperly. However, the trial court concluded that Mr. Griffin did not present evidence showing actual contamination or tampering by those who gathered the evidence, and Officer Able (now Detective Able), who did not wear gloves or a hair net, testified that he personally did not collect any evidence. Thus, Mr. Griffin simply pointed out weak links in the State's chain of custody, which was insufficient to meet his burden to affirmatively prove actual tampering or bad faith on the part of the State.

¶ 46 In addition, the trial court allowed the jury to weigh the evidence against Mr. Griffin's contentions regarding the weak links in the chain of custody.[7] By permitting the jury to do so, the trial court satisfied the "two-tiered analysis" standard laid out in *State v. Eagle Book, Inc.* As a result, we conclude that the trial court did not abuse its discretion when it admitted the mtDNA hair evidence.

*B. Expert Testimony*

¶ 47 The trial court did not abuse its discretion by allowing "Dr. Terry Melton to testify about the estimated statistical frequency of

---

[7] We also note that Mr. Griffin's argument that the State conceded "contamination was possible" does not establish an abuse of discretion by the trial court. The State was "not required to eliminate every conceivable possibility that the evidence may have been altered." *State v. Bradshaw*, 680 P.2d 1036, 1039 (Utah 1984). All it was required to do was to satisfy the trial court that the evidence "ha[d] not been tampered with." *State v. Eagle Book, Inc.*, 583 P.2d 73, 75 (Utah 1978). The State did so. Furthermore, despite Mr. Griffin's assertion to the contrary, the State did not concede that the evidence in this case was contaminated. *See infra* ¶ 55.

[Mr.] Griffin's mtDNA." Mr. Griffin argues that the use of mtDNA evidence is not reliable or based upon "sufficient facts or data" as required by rule 702(b). UTAH R. EVID. (2008).[8] Specifically, Mr. Griffin argues that Dr. Melton's claim about the statistical frequency of his mtDNA was "not testable, was not subject to peer review, has an unknown error rate, and has not been independently verified." The State asserts that the statistical evidence in this case "met the threshold standard [for admissibility]" and that Dr. Melton's "statistical methodology was generally accepted and based on a collaborative database assembled by [the Scientific Working Group on DNA Analysis Methods (SWGDAM)], a scientific body that sets standards for DNA testing nationwide." We hold that Dr. Melton's testimony about the statistical frequency of Mr. Griffin's mtDNA met the requirements of rule 702. Therefore, it was not an abuse of discretion for the trial court to allow the testimony of Dr. Melton.

¶ 48   During Mr. Griffin's trial, rule 702(b) stated that

> [s]cientific, technical, or other specialized knowledge may serve as the basis for expert testimony if the scientific, technical, or other principles or methods underlying the testimony meet a threshold showing that they (i) are reliable, (ii) are based upon sufficient facts or data, and (iii) have been reliably applied to the facts of the case.

*Id.* (2008). To satisfy the threshold showing, a party must show that "the principles or methods on which such knowledge is based, including the sufficiency of facts or data and the manner of their application to the facts of the case, are generally accepted by the relevant expert community." *Id.* 702(c) (2008). Numerous other state courts have found mtDNA evidence reliable, when analyzed based on relevant statistical methods, under similar evidentiary tests. *See, e.g., United States v. Beverly*, 369 F.3d 516, 527–30 (6th Cir. 2004); *State v. Pappas*, 776 A.2d 1091, 1113 (Conn. 2001); *Vaughn v. State*, 646 S.E.2d 212, 214–15 (Ga. 2007); *State v. Scott*, 33 S.W.3d 746, 756–61 (Tenn. 2000); *State v. Brochu*, 949 A.2d 1035, 1048–50 (Vt. 2008).

---

[8] Rule 702 was amended in 2011, we cite to the version that was in place at the time of Mr. Griffin's trial.

¶ 49 Dr. Melton's expert testimony met the requirements of rule 702. Dr. Melton testified that her statistical analysis of the mtDNA hair evidence was based on two equations, which had been cited in a peer-reviewed article, that people in the field of mtDNA analysis would be familiar with and routinely rely on. Using these equations, Dr. Melton compared the results from the testing of the mtDNA hair evidence to the SWGDAM database maintained by the FBI, which contains 4,800 mtDNA samples.[9] She found that 99.94 percent of individuals could be excluded as contributors of the hair, but not Mr. Griffin. Dr. Melton's testimony established that the analysis of the statistical frequency of Mr. Griffin's mtDNA was conducted using a method "generally accepted by the relevant expert community." UTAH R. EVID. 702(c) (2008). Despite Mr. Griffin's assertions to the contrary, the equations and methodology that Dr. Melton used were subject to peer review and, as we discuss in the section below, the limitations of her statistical analysis were fully disclosed to the jury. Even though the results of the analysis of Mr. Griffin's mtDNA were not "independently verified" by an individual other than Dr. Melton, such independent verification is not required by the rule. *Id.* (2008). As a result, we conclude that Dr. Melton's expert testimony met the requirements of rule 702 and that the trial court did not abuse its discretion when it admitted that expert testimony.

*C. Rule 403*

¶ 50 Mr. Griffin also argues that the mtDNA hair evidence was unfairly prejudicial under rule 403 and thus was inadmissible. UTAH R. EVID. Specifically, Mr. Griffin argues that since the distribution of mtDNA is "highly impacted by geographic clustering and . . . is not random," introducing "mtDNA for inculpatory purposes is . . . misleading." Furthermore, Mr. Griffin claims that because "mtDNA is a tool of exclusion rather than identification" and because it is impossible

---

[9] We note that other states have found the use of mtDNA evidence reliable, even in cases where the mtDNA was analyzed by comparing it against a database containing fewer samples than the SWGDAM database used in this case and where the exclusion rates were lower than here. *See, e.g.*, *State v. Underwood*, 518 S.E.2d 231, 239 (N.C. Ct. App. 1999) (holding the use of mtDNA evidence reliable with a 10 percent exclusion rate and a comparison sample database of around 1,000 individuals).

to know its frequency, "mtDNA is too complex for lay jurors to understand its limitations as a tool of inculpation." In addition, because "the SWGDAM is less than 0.000016 of the United States population," it cannot be representative of the population and thus any conclusions made based on a comparison of the SWGDAM database "are based on speculation and conjecture."

¶ 51 The State asserts that the mtDNA hair evidence was not unfairly prejudicial under rule 403. It argues that the "statistical limitations [of mtDNA evidence] were fully disclosed to the jury." In addition, "[d]efense counsel explored the limitations of the statistical evidence" at trial. Furthermore, despite its statistical limitations, the analysis of mtDNA evidence is "a highly discriminatory exclusionary test comparable, if not superior, to . . . HLA haplotype testing," which has been held admissible, and is far more discriminatory than evidence of blood type, which has long been admitted in Utah courts. We hold that the mtDNA hair evidence was not unfairly prejudicial under rule 403 and thus was admissible.

¶ 52 Under rule 403, evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice." *Id.* As pointed out above, *supra* ¶ 48, every state that has been confronted with the question of whether mtDNA is admissible under its applicable rules of evidence has answered the question in the affirmative. In the present case, the statistical limitations of the mtDNA analysis were fully disclosed to the jury. The jury was informed that the mtDNA analysis did not identify Mr. Griffin absolutely but that, rather, the testing could not exclude him as a source of the hair. In addition, and as the State correctly points out, Mr. Griffin's attorneys thoroughly attacked the validity of the mtDNA hair evidence at trial. The probative value of the mtDNA hair evidence was not "substantially outweighed by a danger of . . . unfair prejudice" when its limitations were fully disclosed. *Id.* As a result, the jury could weigh the mtDNA hair evidence based on its evaluation of the reliability of the evidence, the method of analysis, and the limitations of that analysis. We conclude that because the methodology and limitations were fully disclosed to the jury, the mtDNA hair evidence did not violate rule 403, and the trial court did not abuse its discretion when it admitted the evidence.

*D. Motions to Dismiss*

¶ 53    We next address Mr. Griffin's argument that the trial court erred when it denied Mr. Griffin's motions to dismiss. Mr. Griffin argues that because he "proved and the State conceded that the evidence was altered with one hair," the trial court "denied him a fair trial" when it denied his motions to dismiss on those grounds.

¶ 54    As discussed in the sections above, the trial court properly admitted the mtDNA hair evidence. Mr. Griffin argues that the case should be dismissed on the ground that the State established an insufficient chain of custody because the hair evidence was altered. Those arguments are, however, based on a false premise because, despite his contentions, Mr. Griffin did not prove that the evidence was altered. Instead, the trial court found that the State had presented sufficient proof of chain of custody to establish that the mtDNA hair evidence "[is] what the State claims [it] to be."

¶ 55    In addition, the State did not "concede[] that the [mtDNA hair] evidence was altered" as Mr. Griffin contends. Rather, the prosecutor admitted that contamination was *possible* but stated that it had not been proved in Mr. Griffin's case and that, because Mr. Griffin had not proved contamination, the mtDNA hair evidence should be submitted to the jury. In context, the prosecutor's statement reads as a concession that there was the possibility of contamination, but whether there was the possibility of contamination is not what the trial court bases its decision on. Instead, the trial court looks at whether a proper foundation has been laid to establish that the evidence is what the State claims. Any contamination must be proved by the defendant, and actual tampering with or contamination of the evidence will not be inferred from the mere possibility of contamination. Consequently, the State did not actually "concede[] that the evidence was altered," despite Mr. Griffin's claim to the contrary.

¶ 56    Because the State established a sufficient chain of custody, because Mr. Griffin did not "prove[] . . . that the evidence was altered," and because the State did not concede that the evidence was contaminated, the trial court did not err in denying Mr. Griffin's motions to dismiss, in which Mr. Griffin claimed that the mtDNA hair evidence could not be used against him. The DNA evidence, including the mtDNA hair evidence, was sufficient for "a reasonable jury [to] find that the elements of the crime had been proven beyond a reasonable

doubt." *State v. Arave*, 2011 UT 84, ¶ 24, 268 P.3d 163. Thus, we do not overturn the denials of Mr. Griffin's motions to dismiss.

*E. Ineffective Assistance of Counsel*

¶ 57   Mr. Griffin makes two ineffective assistance of counsel claims relating to the mtDNA hair evidence. First, he claims that trial "[c]ounsel were ineffective for not moving to exclude [the mtDNA hair evidence] on the ground that none of the hairs offered against [Mr.] Griffin came from the [crime] scene." To support this assertion, he states that the record shows that "the hair evidence was altered with hairs not collected from the [crime scene]." Second, he claims that his lawyers were ineffective for not investigating an alleged one-day "delay between Detective Spencer 'overnight[ing]' evidence on Tuesday, February 13, 2007, and Mitotyping[] [Technologies'] receipt of [allegedly] different evidence two days later." According to Mr. Griffin, since the State relied heavily on the mtDNA hair evidence, these errors by counsel were prejudicial. Under the *Strickland* test, Mr. Griffin must show (1) "that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment" and (2) "that counsel's performance prejudiced [him], meaning that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Griffin*, 2015 UT 18, ¶ 15, ___ P.3d ___ (internal quotation marks omitted). For his first ineffective assistance of counsel claim, Mr. Griffin failed to meet the first prong of the *Strickland* test, and for his second claim, he failed to meet the second prong of the *Strickland* test. Therefore, Mr. Griffin's ineffective assistance of counsel claims fail.

¶ 58 Contrary to Mr. Griffin's assertion, the record does not establish that the mtDNA hair evidence was altered. Indeed, the trial court found that the mtDNA hair evidence was *not* altered. According to the trial court, the State established that "the hairs, which were vacuumed or located on the victim's clothing and submitted to the [c]rime [l]ab in 1984, included the hairs which were matched to [Mr. Griffin] by . . . Mitotyping Technologies" and that "the hairs in question are the . . . hairs, which were . . . located at the crime scene in 1984." The evidence Mr. Griffin presented did not establish alteration of the mtDNA hair evidence and any motion based on those grounds would have been futile because it would have been based on allegations that were not proved. Since the trial court ruled that the

mtDNA hair evidence was not altered, it was not "deficient performance" for Mr. Griffin's counsel to fail to move to exclude the evidence on that ground. Therefore, Mr. Griffin did not meet the first prong of the *Strickland* test, and counsel were not ineffective for not moving to exclude the mtDNA hair evidence based on Mr. Griffin's allegations of alteration.

¶ 59   Mr. Griffin's second ineffective assistance of counsel claim is based on the allegation that his counsel were ineffective for not investigating the alleged one-day delay between Detective Spencer's receiving the mtDNA hair evidence from the crime lab in order to submit it for testing and the receipt of the evidence by Mitotyping Technologies two days later. That claim also fails. Even if Mr. Griffin had established that there actually was a one-day delay between Detective Spencer receiving the hair evidence and his overnighting of that evidence, such a delay does not prove or give rise to an inference of tampering with the evidence. A similar situation was seen in *State v. Bradshaw*, where a defendant contested the chain of custody for a piece of evidence that had "remained overnight in a box ready for mailing in the locked office of a sheriff whose deputies also had access to the office." 680 P.2d at 1039. In that case, we held that because there was "no evidence suggest[ing] that [the deputies] or anyone else had tampered . . . with the box," a one-day delay in the mailing of evidence did "not necessarily constitute a break in the chain of custody." *Id.* at 1039–40. In the case at hand, Mr. Griffin likewise presented "no evidence suggest[ing] that [police or individuals at the Box Elder County Sheriff's Office] tampered . . . with" the mtDNA hair evidence. Therefore, *State v. Bradshaw* strongly suggests that the one-day delay in mailing the evidence does not constitute a break in the chain of custody. Because a one-day delay would be insufficient to show actual tampering or bad faith, Mr. Griffin has not shown a "reasonable probability that . . . the result of the proceeding would have been different" if his counsel had investigated the alleged one-day delay. *Griffin*, 2015 UT 18, ¶ 15. Thus, Mr. Griffin fails to meet the second prong of the *Strickland* test because he did not "show that counsel's performance prejudiced [him]." *Id.* (internal quotation marks omitted). Consequently, Mr. Griffin's allegations of ineffective assistance of counsel dealing with the mtDNA hair evidence fail.

## III. ACTUAL CONFLICT OF INTEREST

¶ 60   Finally, we address Mr. Griffin's claim that his counsel, Mr. Demler, had an actual conflict of interest with Mr. Griffin.

Mr. Demler's role at trial was limited to the cross-examination of the State's witness, Benjamin Britt. When we initially heard this case, we remanded the issue of whether Mr. Griffin's counsel Mr. Demler had an actual conflict of interest with Mr. Griffin to the trial court for a rule 23B hearing at which the trial court was to develop the facts and to determine whether an actual conflict existed. *State v. Griffin*, 2015 UT 18, ¶ 30, __ P.3d __.

¶ 61   In March 2006, Mr. Demler had represented Frank Archuletta, who was in the Davis County Jail with Mr. Griffin's codefendant, Wade Maughn. Back then, Mr. Archuletta claimed that Mr. Maughn had told him about the murder of Mr. Perry, including information that implicated Mr. Griffin and an unnamed third person. Mr. Demler arranged a meeting between Mr. Archuletta and state investigators to discuss the possibility of working out a deal in exchange for the information. Mr. Archuletta did not come to an agreement with the State, his meeting with the investigators lasted only about ten minutes, he did not contact Mr. Demler again about the matter, and Mr. Archuletta did not testify at Mr. Maughn's or Mr. Griffin's trials.

¶ 62 The trial court concluded that no actual conflict existed between Mr. Demler and Mr. Griffin. The trial court found that Mr. Demler "vigorously cross-examined [Mr.] Britt" and that Mr. Griffin's other counsel were "apparently satisfied that there was no conflict" when they asked Mr. Demler to cross-examine Mr. Britt. The trial court also found that because Mr. Demler's representations of Mr. Archuletta and Mr. Griffin "were not at all concurrent" but "more than thirty months apart," no conflict inhered in Mr. Demler's representation of Mr. Griffin. As a result of its findings, the trial court concluded that "[Mr.] Griffin [did] not show[] that [Mr.] Demler had a conflict of interest that adversely affected [Mr.] Demler's performance in his limited cross-examination of a single witness during a nearly month-long trial."

¶ 63   Mr. Griffin now argues that the trial court's factual findings at the rule 23B hearing are clearly erroneous and that the trial court clearly erred by not presuming prejudice in Mr. Demler's representation of him.[10] He claims that Mr. Demler's representation

---

[10] Mr. Griffin argues that Mr. Demler's representation amounts to structural error and that prejudice is therefore presumed. His argument

(cont.)

amounts to a Sixth Amendment violation. Mr. Griffin also reads the *Griffin* decision as declaring that certain facts, if established at the rule 23B hearing, prove an actual conflict.[11]

¶ 64 The State counters that the trial court properly found that Mr. Griffin did not establish a Sixth Amendment conflict because the facts Mr. Griffin presented did not establish that Mr. Demler had an actual conflict. The State further asserts that since the representation of Mr. Griffin was not coterminous with that of Mr. Archuletta, but rather took place more than two years later, there was no concurrent conflict.

---

is that because Mr. Demler had an actual conflict of interest, "never conducted any kind of investigation, [never] prepared a trial strategy," and never spoke to Mr. Griffin about the case, "Mr. Griffin was completely denied his right to counsel during [Mr.] Britt's testimony." But, as discussed in this section, Mr. Demler did not have an actual conflict of interest with Mr. Griffin. In addition, the reason Mr. Demler did not conduct independent investigations or speak with Mr. Griffin about trial strategy was that his role was "for the limited purpose of cross-examining [Mr.] Britt." Furthermore, Mr. Demler

> vigorously cross-examined [Mr.] Britt at trial, questioning his ability to accurately hear [Mr.] Griffin's conversations with his cellmate and impeaching him with: his prior conviction for child molestation involving incest; his alleged encouragement of the victim in that case to get an abortion; his inability to identify [Mr.] Griffin in court; the publicly available nature of many of the facts of [Mr.] Griffin's case; and [Mr.] Britt's deal with the prosecution.

There is no evidence that Mr. Demler's representation of Mr. Griffin was deficient or affected by any alleged conflict of interest. As a result, we hold that there was no structural error and thus no prejudice to be presumed from Mr. Demler's representation of Mr. Griffin.

[11] Mr. Griffin alleges that those facts include that Mr. Demler represented Mr. Archuletta and contacted detectives on his behalf after he claimed to have information that incriminated Mr. Griffin and his codefendant in Mr. Perry's murder, as well as that "Mr. Archuletta expressed willingness to aid in the State's investigation and to appear as a witness for the State." *State v. Griffin*, 2015 UT 18, ¶ 25, ___ P.3d ___.

¶ 65 We agree with the State. Mr. Griffin misrepresents what we said in *Griffin*, where we indicated that certain facts, if true, *could*, not *would*, establish an actual conflict. In addition, there was no actual conflict between Mr. Griffin and Mr. Demler that violated the Sixth Amendment. As a result, the trial court did not have to presume prejudice in Mr. Demler's representation of Mr. Griffin during the cross-examination of Mr. Britt.

¶ 66 In *Griffin*, we remanded for a rule 23B hearing to establish additional facts related to Mr. Griffin's conflict of interest claim with Mr. Demler. *Id.* We noted that Mr. Griffin's "allegations, if true, *could* constitute deficient performance. *If* the trial court finds that Mr. Griffin . . . demonstrated an actual conflict of interest, . . . the[] allegations *could* support a determination that counsel's ineffectiveness prejudiced the result." *Id.* (emphases added). Mr. Griffin would have us read the conditional language out of our decision in *Griffin* and claims that "[t]he facts that this Court determined created an actual conflict . . . were established at the [rule] 23B hearing." But, we never declared that certain facts, if true, conclusively established a conflict of interest. Instead, we left the factual determination up to the trial court and declared that certain facts *could* constitute an actual conflict that *could* have resulted in prejudice, depending on the findings of the trial court. *Id.* Furthermore, we defer to a trial court's factual findings from a rule 23B hearing. *State v. Taylor*, 947 P.2d 681, 685 (Utah 1997). Thus, Mr. Griffin's contention that we instructed or implied that the trial court should have found an actual conflict when Mr. Griffin presented certain facts to the trial court is clearly mistaken.

¶ 67 Furthermore, the trial court found that Mr. Griffin did not establish an actual conflict under the Sixth Amendment. To establish a conflict of interest under the Sixth Amendment, "a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980). The defendant "must demonstrate 'as a threshold matter . . . that the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests.'" *Taylor*, 947 P.2d at 686 (alteration in original) (citation omitted). In this case, the trial court believed the testimony of Mr. Demler when he said that Mr. Griffin's other counsel, Mr. Richards and Mr. Smith, knew of Mr. Demler's representation of Mr. Archuletta and that they did not believe that it created a conflict of interest. The conflicting testimony of Mr. Demler that he did not believe Mr. Archuletta was on any of the State's witness

lists and that he would not have agreed to cross-examine Mr. Britt if Mr. Archuletta were on the State's witness lists[12] was not credited by the trial court. The trial court also did not credit the testimony of Mr. Richards who stated that, in hindsight, he now believed Mr. Demler and Mr. Griffin had a conflict of interest because of Mr. Archuletta; Mr. Richards also testified that he did not take issue with the substance of Mr. Demler's cross-examination of Mr. Britt, only the method. Because "[w]e defer to [the] trial court's findings of fact" from a rule 23B hearing, we will not second-guess these factual findings of the trial court. *Id.* at 685.

¶ 68 Finally, Mr. Demler's representation of Mr. Archuletta and Mr. Demler's representation of Mr. Griffin were separated by more than two and a half years. As a result, the trial court found that Mr. Demler's representations were not concurrent. Consequently, no conflict inhered in Mr. Demler's representation of Mr. Griffin. *See* UTAH R. PROF'L CONDUCT 1.7.

¶ 69 As a result, Mr. Griffin falls short of his burden to "demonstrate . . . that the defense attorney [Mr. Demler] was required to make a choice advancing his own interests to the detriment of [Mr. Griffin's] interests." *Taylor*, 947 P.2d at 686 (internal quotation marks omitted). He presented no evidence to the trial court showing that Mr. Demler made any decision in his representation of Mr. Griffin that was based on an interest adverse to Mr. Griffin or that Mr. Archuletta benefited from Mr. Griffin's conviction. In fact, the trial court found that "[Mr.] Demler vigorously cross-examined [Mr.] Britt at trial." There was no actual conflict between Mr. Demler and Mr. Griffin, and thus there was no prejudice to be presumed from Mr. Demler's representation of Mr. Griffin during the cross-examination of Mr. Britt. Consequently, Mr. Demler's representation of Mr. Griffin did not violate his rights under the Sixth Amendment.

## CONCLUSION

¶ 70 In conclusion, we affirm Mr. Griffin's conviction. The trial court did not abuse its discretion when it admitted the nuclear DNA

---

[12] Mr. Archuletta, in fact, was listed on the State's potential witness lists as a witness that the State "[m]ay [c]all [b]ut [d]oes [n]ot [a]ppear [l]ikely [to call] at [t]his [t]ime."

blood evidence and the mtDNA hair evidence, and none of the foundational evidence for the nuclear DNA blood evidence or the expert's testimony about the statistical frequency of Mr. Griffin's mtDNA violated the rules of evidence or Mr. Griffin's constitutional rights. Mr. Griffin's counsel were not ineffective for failing to move to exclude the mtDNA hair evidence on the ground that the mtDNA hair evidence was altered. In addition, the trial court did not err when it denied Mr. Griffin's motions to dismiss based on the mtDNA hair evidence. Mr. Griffin's representation by Mr. Demler during the cross-examination of Mr. Britt was not prejudicial because Mr. Demler did not have an actual conflict of interest with Mr. Griffin. Finally, we do not address the rest of Mr. Griffin's claims because even if we assume that those claims established errors, given the overwhelming DNA evidence against Mr. Griffin, any such errors would not have resulted in a reasonable likelihood of a different outcome.

———————