**2023 UT App 135**

# THE UTAH COURT OF APPEALS

IN THE MATTER OF THE AGUSTA NATIONAL TRUST #1

MICHELE WEEKS,
Appellant,
*v.*
MICHAEL GRAY WEEKS, JESSICA ELIZABETH WEEKS, MISSY LEIGH
WEEKS, NATALIE SUSANNAH WEEKS, AND GINGER MONSEN,
Appellees.

Opinion
No. 20210636-CA
Filed November 9, 2023

Third District Court, Salt Lake Department
The Honorable Heather Brereton
No. 193900350

Kenneth L. Reich and Daniel F. Bertch,
Attorneys for Appellant

Robert E. Mansfield and Megan E. Garrett,
Attorneys for Appellees

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and RYAN D. TENNEY
concurred.

MORTENSEN, Judge:

¶1     Mark Twain had "no respect" for the person who could "spell a word only one way."[1] But consistent spelling proves to be

---

1. The attribution to Samuel Clemens is a matter of some dispute. There are many variations on the quip, along with numerous potential originators. *See No Respect for a Man Who Can Spell a Word Only One Way*, Quote Investigator, https://quoteinvestigator.com

(continued…)

remarkably helpful—as this case demonstrates—when drafting legal documents. Ken Weeks placed two pieces of property into the same irrevocable trust, or so it appeared. Confusion crept in for two reasons. First, Ken[2] conveyed those two properties using two different spellings for the trust. Although Ken conveyed these properties while married to his first wife, this inconsistency led his second wife, Michele Weeks, to contend after Ken's death that there were really two trusts, an arrangement that would be to her benefit. Second—and unrelated to the spelling issue—the divorce decree for Ken's first marriage distributed an interest in the two pieces of trust property, leading Michele to assert that the irrevocable trust had been modified. The district court did not agree with Michele on either point and granted summary judgment in favor of the children from Ken's first marriage. We affirm.

## BACKGROUND

¶2    Ken married Sue Ruff in 1983, and they had four children together: Michael Gray Weeks, Jessica Elizabeth Weeks, Missy Leigh Weeks, and Natalie Susannah Weeks.

---

/2010/06/25/spelling [https://perma.cc/7G5Y-G2T2]; *see also* Lay Kim, *Never Trust a Man Who Has Only One Way to Spell a Word*, Quotationize, https://quotationize.com/never-trust-a-man-who-has-only-one-way-to-spell-a-word [https://perma.cc/5V78-2CLW ]; *The Yale Book of Quotations* 782 (Fred R. Shapiro Ed., Yale Univ. Press 2006).

2. For readability, consistency, and clarity, we will use given names throughout this opinion.

*Agusta Trust*

¶3    On November 23, 1993, Ken created the "The Agusta National Trust #1" (Agusta Trust).[3] Ken designated himself as "Settlor" of the Agusta Trust and his sister, Ginger Monsen, as "Trustee." The Agusta Trust named a successor trustee but also provided that if both trustees resigned, the beneficiaries could appoint a new trustee by majority vote.

¶4    The trust corpus consisted of property "listed in the schedule annexed hereto."[4] The Agusta Trust also provided that "Settlor reserves the right to . . . add to the principal" and that "any property so added shall be held, administered, and distributed under the terms of this agreement." Two pieces of real property were subsequently transferred to the Agusta Trust—or so it seems. First, a lot in Emigration Canyon (Emigration Lot) was deeded to "GINGER *MONSON*, TRUSTEE OF THE *AUGUSTA NATIONAL TRUST*," on August 30, 1995. (Emphases added.) Second, a house in Draper (Draper House) was deeded to the "*AGUSTA NATIONAL TRUST #1*, GINGER *MONSEN*, TRUSTEE," on January 16, 1998. (Emphases added.) We note the spelling and nomenclature differences between the two conveyance documents: (1) the spelling of "Monson" for the Emigration Lot versus "Monsen" for the Draper House, (2) the

---

3. The Appellees note, "Ken was a very avid golfer and would name things after famous golf courses, including St. Andrews and Augusta National. Ken was also notorious for his poor spelling." Having said this, the reader should be aware that the two names ("Agusta National Trust #1" and "Augusta National Trust") used for the trust are important in this opinion. Because of the unique relevance of Ken's poor spelling to the matters in this case, when we quote his writings, we have purposely not corrected the spelling or grammar.

4. The record does not contain the original schedule or indicate if there was one.

spelling of "Augusta" for the Emigration Lot versus "Agusta" for the Draper House, and (3) the inclusion of "#1" on the conveyance of the Draper House versus its absence on the Emigration Lot's conveyance.

¶5     We recite other relevant provisions of the Agusta Trust:

> *This trust shall be irrevocable.* Settlor shall not have any right to amend or otherwise alter or revoke this trust in any manner whatsoever or to alter or divest the interests of or change the beneficiaries, or vest the power to terminate or amend this trust in any other person.
>
> . . . .
>
> During the lifetime of Settlor or *Settlor's wife, M. SUE WEEKS*, Trustee shall pay to or for the benefit of Settlor, Settlor's wife, or Settlor's children as much of the net income and principal of the trust as Trustee deems necessary for their health, support, and maintenance.
>
> . . . .
>
> Upon the death of Settlor and Settlor's wife, Trustee shall distribute the entire remaining principal of the trust . . . [t]o each living child of Settlor [in equal shares].

(Emphases added.) The Agusta Trust identified by name Ken's three then-born children (namely, Michael, Jessica, and Missy). It also stated that the terms "child" and "children" included "any children which are born to Settlor or adopted by Settlor subsequent to the date of execution of this trust agreement." However, the Agusta Trust made no mention of what might happen to the identity of "Settlor's wife" in the event of divorce.

The only future provision it had with regard to "Settlor's wife" concerns what happens upon her death, as recounted above.

*Divorce and Remarriage*

¶6 Ken and Sue divorced on October 8, 1999. The divorce decree is significant in this appeal for how it divided interest in the Draper House and the Emigration Lot. The decree stated,

> The *property of the parties* is awarded as follows with the award of each party to be free of any claim of the other except as expressly provided:
>
> > a. [Ken] is awarded *the interest of the parties* in the [Draper House] . . . .
> >
> > b. [Ken] is awarded the Emigration [L]ot, *subject to any and all liability thereon*.[5]

(Emphases added.) Notably, the divorce decree never mentioned the Agusta Trust (or any other trust). And neither the Agusta Trust nor its trustee, Ginger, was a party to the divorce.[6]

---

5. The decree also addressed the division of other real and personal property and assets not relevant to this appeal.

6. In a declaration dated July 1, 2020, Sue stated that amendment of the Agusta Trust was never discussed during the divorce proceedings—nor was the existence of any other trust—and that she had "no intent to amend [the Agusta Trust], affect the children's interests therein, or alter the beneficiaries thereof through the divorce proceedings and the Decree of Divorce."

¶7  The next day, Ken married Michele Weeks, and the couple resided in the Draper House. They eventually had two children together.[7]

*2006 Instruction*

¶8  On September 28, 2006, Ken executed a one-page document (2006 Instruction), which we recite here:

Grantor of
Augusta National Trust
[Street address of Draper House]
9/28/2006

Instructions for Trustee Ginger Monsen

This document will serve as a legal document to clarify any previous instructions that are now void due to changes in my life. I now have six children, [the children are named, along with their ages]. The above children are all my natural living children and become the beneficiaries of the assets of Augusta National Trust. The Trust has two main assets, these are:

- [Draper House]
- [Emigration Lot]

It is my wishes and instructions to do the following with these assets, my wife Michele Martin Weeks has the right to live in the [Draper House], for up to 5 years after my death. All contents of the house are my wife's property. At that time the house should be sold and the proceeds should be divided between

---

7. All of Ken's children, including those he had with Michele, have now reached the age of majority.

my six children. Each one can take the money if they are of legal age, a child whom is under age will have their money put into an interest baring trust account . . . . It is very important to stay within my guidelines of placing the money into trust accounts where each underage child has the money waiting for them as they grow to legal adults. It is not possible to use the money as a means to care for the child, this money is for there use as they see fit when they turn 18. The [Emigration Lot] is given to my wife Michele Martin Weeks for her to own and live, build, sell or do as she wishes. As the Grantor of this trust listed above, these are now the instructions to adhere to by the trustee Ginger Monsen.

The document was notarized and signed by Ken as "Grantor" and Ginger as "Trustee."

*2012 Email*

¶9      In an email dated June 5, 2012, Ken, who was apparently going on vacation, wrote to his son, Michael, that the Draper House and Emigration Lot "are in the Augusta National trust, beneficiaries are my six children equally." The email went on to state, "Ginger is the trustee of the Augusta Trust, However if I or Michele become deceased, please show Ginger this email, because now you will make all decisions to any of my assets or Michele's for all living children of Ken Weeks."[8]

*2017 Letter*

¶10     On September 15, 2017, Ken delivered a handwritten letter (2017 Letter), transcribed here, to Michael:

---

8. The email addressed other financial concerns not relevant here.

> Michael Gray Weeks
>
> Pleas take these instructions + follow through the owneship + Request.
>
> – [Draper House] is in: Augusta National Trust – Free And clear title – leans have been satisfied + are in side Desk filing cabinet.
>
> – [Emigration Lot] – Free + clear + leans are satisfied in Desk filing cabinet.
>
> [Identification of other assets not at issue here]
>
> Please follow these instructions—

Ken signed and dated the letter.

*Ken's Death and Subsequent Lawsuit*

¶11   Ken died unexpectedly on January 16, 2018. Michele and their two children continued to reside in the Draper House. Ginger stated that Michele approached her and "asserted that she and her sons could remain in the Draper [House] for five years and that she would receive the Emigration [Lot]." Ginger also reported that Michele pressured her to deed the Draper House to her and that Michele wanted the Agusta Trust to pay taxes, fees, and maintenance costs on the Draper House. Ginger resigned as Trustee of the Agusta Trust in September 2018, and the children of Ken and Sue elected Michael to serve as the new trustee. Given the cost of maintenance and repair for the Draper House, "it was determined that the best course of action was for the [Agusta] Trust to sell the Draper [House] and distribute the proceeds to the six children of Ken."

¶12 Michele refused to vacate the property. And in February 2019, she commenced the present action, stating seven claims for relief:

1. Declaratory judgment that a second trust called the "Augusta National Trust" (Second Trust[9]) had "a separate legal existence" from the Agusta Trust, that the Emigration Lot was the property of the Second Trust, and that Michele was entitled to ownership of the Emigration Lot;

2. Declaratory judgment that Ken—as a result of the divorce decree—took title to the Draper House (and the Emigration Lot to the extent that it was held in the Agusta Trust) from the Agusta Trust, that Michele was entitled to a five-year tenancy (or equitable interest) in the Draper House, and that Michele was entitled to ownership of (or equitable interest in) the Emigration Lot;

3. Declaratory judgment that the Agusta Trust was made revocable upon entry of the divorce decree and that Michele was entitled to a five-year tenancy in the Draper House and ownership of the Emigration Lot;

4. Declaratory judgment that entry of the divorce decree modified the Agusta Trust to remove Sue as "Settlor's wife" and substitute her with Michele;

---

9. Michele initially referred to this second trust as the "Augusta Trust" in her complaint, but later filings clarify its name to be the "Augusta National Trust," apparently to match the spelling used in the conveyance of the Emigration Lot, the 2006 Instruction, and the 2012 Email. To address the possible confusion that might arise from similarities in spelling, we use the appositive "Second Trust" for the Augusta National Trust.

5. Declaratory relief that Michael was not the trustee of the Second Trust and that Ginger was the trustee of the Second Trust;

6. An order removing Michael as trustee of the Agusta Trust owing to his purported breach of fiduciary duties; and

7. An order enjoining the sale of the Draper House or the Emigration Lot.

¶13 In articulating these claims for relief—in particular the breach of the fiduciary duty claim—Michele stated that Michael (1) refused to recognize the existence of two trusts; (2) regarded the Draper House and the Emigration Lot as assets of the Agusta Trust; (3) refused to recognize Michele as a beneficiary of the Agusta Trust; (4) refused to acknowledge that the 2006 Instruction constituted the Second Trust agreement and that it was binding on him and the Agusta Trust; (5) maintained the Agusta Trust was irrevocable, notwithstanding the effects of the divorce decree to divest Sue of her interest in its properties; (6) maintained that the Agusta Trust could evict Michele and her children; and (7) maintained that he had the authority to sell the Draper House and the Emigration Lot on behalf of the Agusta Trust. Michele alleged that Michael breached his fiduciary duties by taking actions based on these positions since doing so would serve his pecuniary interest by entitling him to "immediate payment of his distributive share" of the Agusta Trust.

¶14 In their answer to Michele's claims, Michael, Jessica, Missy, Natalie, and Ginger (collectively, the Appellees) filed counterclaims against Michele. First, they asserted that Michele was in unlawful detainer of the Draper House because the Agusta Trust owned the property, Michele was a tenant at will, and she had failed to vacate the property after a five-day notice to quit

tenancy.[10] Second, the Appellees sought recovery for waste, alleging that Michele had "committed acts of destruction, misuse, alteration, [or] neglect" on the Draper House during her tenancy.

¶15   The Appellees subsequently filed a motion for partial summary judgment, seeking judgment against Michele on all her claims and in favor of their unlawful detainer claim.

¶16   As to Michele's claims, the Appellees argued that "the undisputed material facts" demonstrated that there was only a single trust, namely the Agusta Trust, and that it owned the Draper House and the Emigration Lot. Further, because the Agusta Trust was irrevocable, the Appellees asserted that Ken's attempt to modify it via the 2006 Instruction was "ineffective." Concerning Michele's sixth claim for breach of fiduciary duty, the Appellees argued that Michele could not prevail because she did not disclose "an expert to establish the standard of care."

¶17   The Appellees also argued that because the Agusta Trust owned the Draper House and because Michele remained there after receiving notice to vacate, the Appellees were "entitled to judgment as a matter of law on their unlawful detainer claim and damages" based on the uncontested lost rental value they had provided.[11]

¶18   In opposing the Appellees' motion for partial summary judgment, Michele asserted that summary judgment was

10. The notice to quit tenancy was served on March 1, 2019. However, Michele remained in the house through December 2020.

11. The Appellees had provided expert testimony that the fair market rental value of the Draper House was $125 per day accruing from March 7, 2019, until Michele vacated the property. They asked for treble damages and attorney fees. Michele disclosed no expert on rental value.

inappropriate because there was sufficient evidence of the Second Trust existing as a "revocable trust separate and apart from" the Agusta Trust, creating a genuine issue of material fact. As evidence of the existence of the Second Trust, Michele pointed to the deed conveying the Emigration Lot to the "Augusta National Trust," which she identifies as the Second Trust, and the 2006 Instruction directing the "disposition of assets in" that same trust. Michele also offered her own testimony, presented by way of her declaration (Declaration), as evidence of her claim:

> Over the course of our marriage, [Ken] and I had numerous conversations regarding his estate plans and the [Second Trust].
>
> In case something happened to [Ken], he showed me where he kept the instrument for [the Second Trust], in the file folder on the left-hand side of his desk.
>
> During our marriage, I read the [Second Trust] instrument. While I cannot recall every term contained therein, I recall that it granted me a five-year tenancy at the [Draper House] and ownership of [the Emigration Lot].
>
> . . . .
>
> Shortly after [Ken's] death on January 16, 2018, Trustee of the [Agusta Trust] Ginger Monsen represented to me that, in accordance with [Ken's] wishes, she knew that my children and I had five years to live in the [Draper House] and that I would receive the Emigration [Lot].
>
> In reliance on [Ginger's] representations to me, and the fact that [Ginger] had never before challenged my right to live in the [Draper House] or

> own the Emigration [Lot], I continued to reside in
> the [Draper House] and pay for the maintenance of
> the [Draper House] and Emigration [Lot].
>
> . . . .
>
> After [Ken's] death, I looked in the file folder
> on the left-hand side of [Ken's] desk to retrieve the
> [Second Trust] instrument. Many documents were
> missing, including [the Second Trust]. I filed a police
> report that Michael Weeks stole trust documents.
>
> I have not located the [Second Trust]
> instrument since [Ken's] death.

(Numbering omitted.)

¶19 In addition, Michele argued that summary judgment was inappropriate because there was sufficient evidence to create an issue of fact that the divorce decree awarded Ken fee simple title to the Draper House, thus removing it from the Agusta Trust. She pointed to the 2006 Instruction as moving the Draper House to the Second Trust and granting her a five-year tenancy to the property. Alternatively, Michele argued that the Appellees were equitably estopped from enforcing the terms of the Agusta Trust because she had "reasonably relied on [the Appellees'] years of inaction in challenging the disposition of property" in the divorce decree and the 2006 Instruction.

¶20 Michele further argued that the divorce decree modified the Agusta Trust to be at least partially revocable and to replace Sue with Michele as "Settlor's wife." Michele also reasserted her entitlement to injunctive relief to remove Michael as trustee of the Agusta Trust because his breaches were "egregious" so as not to require expert testimony. Finally, Michele argued that summary judgment was inappropriate on the Appellees' unlawful detainer

claim because she had a right to reside in the Draper House for five years after Ken's death.

¶21   The district court granted Appellees' motion for partial summary judgment.

¶22   First, the district court ruled that Michele "failed to present any relevant, admissible evidence to support the establishment" of the Second Trust or of Ken's "intent *to create*" the Second Trust. The court explained that the formation of a valid trust requires (1) the intent of the settlor to create a trust, (2) a clear specification and setting aside of the trust property, and (3) an adequately clear articulation of the terms such that a court would be able to enforce the trustee's duties. *See Sundquist v. Sundquist*, 639 P.2d 181, 183–84 (Utah 1981). From this foundation, the court noted that there was no writing to satisfy "the requirement to constitute a trust other than the document creating" the Agusta Trust. The court explained that it could not read Ken's writings (namely, the 2006 Instruction and the 2017 Letter) as evidence of the Second Trust or an intent to create the Second Trust because they did not contain language evidencing the creation of a trust. And the court determined that the Declaration consisted of "self-serving and inadmissible statements regarding the existence of a second trust," noting,

> Though Michele by [her] Declaration asserts that a second trust was created and that she saw a second trust document, she cannot offer evidence of its terms and conditions. The only terms she offers are identical to those contained in the [2006 Instruction]. Much of her Declaration includes statements allegedly made to her by Ken over a number of years which this Court finds are not admissible as evidence to support her contention.

¶23   Second, the district court ruled that the Agusta Trust was "irrevocable and could not be amended or altered by Ken," even

if he attempted to do so in the 2006 Instruction. The court explained that the 2006 Instruction failed to modify the Agusta Trust because, under Utah law, an irrevocable trust cannot be modified absent the consent of all the beneficiaries. *See* Utah Code § 75-7-411(1).[12]

¶24   Third, the court determined that the divorce decree did not terminate the Agusta Trust or modify it to make it a revocable trust. The court explained that the divorce court had jurisdiction only over the property owned by Sue and Ken. And because both properties had been conveyed to the Agusta Trust, the court concluded that the divorce decree limited itself to the "possessory interest" the parties had in those properties.

¶25   Fourth, the court ruled that Michele's equitable estoppel claim regarding a five-year tenancy in the Draper House failed because Michele had not shown how the Agusta Trust was bound by the 2006 Instruction or the 2017 Letter. Further, the court explained that Michele "never set forth the specific facts affiliated with the alleged statement, admission, act, or failure to act by the Trustee of [the Agusta Trust], or how said conduct was inconsistent with a claim later asserted."

¶26   Fifth, the court ruled that Michele's claim of breach of fiduciary duty failed as a matter of law because Michele had not designated an expert regarding the standard of care Michael owed.

¶27   Lastly, the court ruled that because it was undisputed that Michele had failed to vacate the Draper House upon notice, the Appellees were entitled to judgment on their unlawful detainer claim. However, because there were "allegations from both parties regarding monies paid for mortgage and maintenance

---

12. An irrevocable trust can be modified judicially under limited circumstances not relevant here. *See* Utah Code § 75-1-411(5).

costs as well as the alleged waste" that had not been resolved, the court reserved the issue of damages for a future proceeding.

¶28    Before the trial on damages, the Appellees filed a motion asking the court to prohibit Michele "from presenting at trial evidence regarding payments made by non-parties to this action and payments made outside the limitations period." The Appellees asserted that Michele had disclosed that she would seek a judgment for mortgage payments and other costs totaling over $300,000 that she had paid related to the Draper House. These payments were made before Ken's death—between 2007 and 2015—by various limited liability companies. In response, Michele asserted that she was "entitled to recover *all* of her contributions to the [Draper House] as offset, whether through her name or through the name of a company she owns," and that she was "entitled to present evidence of payments made by entities she owns and controls." She argued that she was "seeking to establish that her companies [were] an alter ego to prevent an inequitable windfall recovery" by the Appellees. In the alternative, Michele argued that if she was prohibited "from presenting evidence of offset payments made by her alter ego companies," under rule 19 of the Utah Rules of Civil Procedure, the companies should be joined so they could "pursue the offset payments themselves." The district court denied the Appellees' motion and allowed Michele to present alter ego evidence in support of potential offset payments.

¶29    In the bench trial on damages, the district court granted the Appellees' motion for judgment as a matter of law. Among other findings of fact, the district court entered the following: Ken had taken out two mortgages on the Draper House; the Agusta Trust did not receive the proceeds of, or receive any benefit from, these loans, rather they were used by Ken; the Agusta Trust never paid the mortgage or other liabilities for the Draper House or the Emigration Lot, rather these payments were made by Ken and Michele, neither of whom paid rent to live in the Draper House; Ken gave Michele $2.5 million, which she used to establish three

single-member limited liability companies; and Michele routinely used these companies' bank accounts to pay her mortgage, tax, utility, repair, personal, and living expenses.

¶30    Based on these facts, the district court ruled that Michele's alter ego claim failed as a matter of law under the two-prong test articulated in *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028 (Utah 1979):

> [I]n order to disregard the corporate entity, there must be a concurrence of two circumstances: (1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals; and (2) the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow.

*Id.* at 1030.

¶31    While there was ample evidence that Michele's association with the three companies satisfied the first prong of the test, the court concluded that Michele had failed on the second prong because she could not demonstrate that "observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow." *See id.*

¶32    Michele had contended that the Appellees would be unjustly enriched by the observance of the corporate form because they would receive the benefit of her paying for taxes and repairs to the properties. The district court rejected this argument by noting that it was "not enough that a benefit was conferred on the [Appellees], rather, the enrichment to the [Appellees] must be unjust in that [they] received a true windfall or 'something for nothing.'" (Quoting *Richards v. Brown*, 2009 UT App 315, ¶ 29, 222 P.3d 69, *aff'd*, 2012 UT 14, 274 P.3d 911.) The district court

explained that money from the mortgages "in no way benefitted" the Agusta Trust because the money was used by Ken to repay debts he incurred "for his benefit." The court observed that, if anything, the "funds borrowed by Ken" constituted a "debt or liability" on the Agusta Trust. And with regard to monies paid by Michele or her alter ego companies, the court concluded,

> [Michele] and her family received a benefit from the funds she expended on the [Agusta Trust's] properties. They lived in the Draper [House] and enjoyed the benefit of the residence for more than twenty years. The facts presented here indicate that [Michele] paid the mortgage debt, taxes, and upkeep on the property in exchange for the benefit of the use of the property. There was no evidence presented which would allow this Court to conclude that the amounts paid by [Michele] exceeded the benefit she received from use of the Draper [House]. While [Michele] presented some evidence of repairs made to the home, no evidence was presented indicating that these repairs increased the value of the home. If [Michele] had not resided in the Draper [House], she would have incurred living expenses to live elsewhere.

¶33 Based on this analysis, the court concluded that Michele "failed to show that the [Agusta Trust] was unjustly enriched by the amounts she paid while living in the Draper [House] and therefore she [could not] meet the second prong of the alter ego test and [was] not entitled to claim the amounts at issue here as a setoff against the [Appellees'] damages associated with their Unlawful Detainer claim." A few months later, the district court entered a judgment against Michele for damages, interest, and attorney fees in the amount of $465,643.66.

¶34 Michele appeals.

ISSUES AND STANDARDS OF REVIEW

¶35   Michele first contends that the district court erred in granting summary judgment in favor of the Appellees against her claim that the divorce decree (1) modified the Agusta Trust to make her the "Settlor's wife" and (2) served to otherwise modify the Agusta Trust. "We review the district court's grant of summary judgment for correctness and take the facts and any inferences to be drawn therefrom in the light most favorable to the nonmoving party." *Dahl v. Dahl*, 2015 UT 79, ¶ 15, 459 P.3d 276 (cleaned up).

¶36   Michele next asserts that the district court erred in its summary judgment ruling when it concluded that Michele's interest in the Draper House was not established by estoppel. We review this issue for correctness. *See id.*

¶37   Michele's third claim is that the district court erred in ruling that she did not present admissible evidence of the existence of the Second Trust. A district court's grant of summary judgment is reviewed for correctness. *See id.* We review "legal questions underlying the admissibility of evidence" for correctness, and we review a "court's decision to admit or exclude evidence" for abuse of discretion. *See State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186 (cleaned up).

¶38   Michele next argues that the district court erred in dismissing her breach of fiduciary duty claim for lack of expert testimony. In a summary judgment context, a "district court's determination that an expert was required to establish the standard of care" is reviewed "for correctness, granting no deference to the district court's legal conclusions." *United Fire Group v. Staker & Parson Cos.*, 2014 UT App 170, ¶ 7, 332 P.3d 394 (cleaned up).

¶39   Michele's last claim is that the district court erred in barring her offset claims based on its conclusion that she failed to

show how the Agusta Trust was unjustly enriched by her payments. "When reviewing a bench trial for sufficiency of the evidence, we must sustain the district court's judgment unless it is against the clear weight of the evidence, or if we otherwise reach a definite and firm conviction that a mistake has been made." *State v. Charles*, 2020 UT App 154, ¶ 8, 477 P.3d 492 (cleaned up).

ANALYSIS

I. The Modification of the Agusta Trust

¶40 Michele argues that the district court erred in determining that the divorce decree did not (1) establish Michele as "Settlor's wife" under the terms of the Agusta Trust or (2) otherwise modify the Agusta Trust.

A. Michele as "Settlor's wife"

¶41 Michele, citing *Dahl v. Dahl*, 2015 UT 79, 459 P.3d 276, contends that because Sue was "only identified in her capacity as 'Settlor's wife' and in no other context," Sue's "beneficiary status as 'wife' terminated" with the divorce decree. *See id.* ¶ 34 ("Because Ms. Dahl is named as a beneficiary only in her capacity as Dr. Dahl's spouse, her beneficiary status terminated with the couple's divorce."). Michele further asserts that even though the divorce decree "removed reference" to Sue, "it did not remove reference to 'Settlor's wife' from the [Agusta] Trust." Michele contends that this term "remained unaffected by the divorce." She also argues that "following [Ken's] marriage to Michele, she became 'Settlor's wife' as a matter of law . . . and thereby became a beneficiary" of the Agusta Trust. Thus, Michele maintains that the "court erred by failing and refusing to acknowledge Michele's position as 'Settlor's wife' and beneficiary of" the Agusta Trust.

¶42 "We employ familiar principles of contract interpretation when construing trust instruments." *Id.* ¶ 29. And "when

interpreting a trust, a court first looks to the trust's four corners to determine the parties' intentions, which are controlling." *Smith v. Smith*, 2017 UT App 40, ¶ 12, 392 P.3d 985 (cleaned up), *cert. denied*, 398 P.3d 54 (Utah 2017). Moreover, courts "consider each trust provision in relation to all of the others, with a view toward giving effect to all and ignoring none." *Id.* ¶ 14 (cleaned up).

¶43 Under these principles, Michele's contention that her marriage to Ken following his divorce from Sue established her as "Settlor's wife" finds little support. The express terms of the Agusta Trust specifically identified Sue as "Settlor's wife," stating that "[d]uring the lifetime of Settlor or Settlor's wife, M. SUE WEEKS, Trustee shall pay to or for the benefit of Settlor, Settlor's wife, or Settlor's children as much of the net income and principal of the trust as Trustee deems necessary for their health, support, and maintenance." Apart from this appositive, the trust instrument does not further address the identity of "Settlor's wife." In contrast to the treatment of the term "Settlor's Wife," elsewhere in the trust instrument, Ken did show that he contemplated possible changes to those identified by more general terms. When discussing the terms "child" or "children," Ken identified by name the three children he then had. But he also included a provision that the terms would include any children born to or adopted by him after the trust instrument was executed. This provision for changes to the number of children shows that Ken certainly contemplated possible changes to those identified by general terms, necessitated by unforeseen circumstances. It follows that if Ken had intended the substitution of another individual for Sue as "Settlor's wife" in the event of divorce and remarriage, he would have included a provision similar to what he had for a change in children to cover such a contingency.

¶44 Furthermore, replacing Sue with Michele as "Settlor's wife" would have required alteration of the trust. But the divorce decree made no such attempt to alter the Agusta Trust, and we decline Michele's invitation to read it as implicitly doing so. At

most, the divorce decree served to deprive Sue of any possessory interest she had in the two properties. But that is as far as it went. It did not somehow replace Michele for Sue, especially given the Agusta Trust's express identification of Sue as "Settlor's wife." Assuming a trust can be modified by way of a decree—a shaky premise as we explain—to do so, at a minimum, requires the divorce decree to purport that it was so modifying an irrevocable trust. It did not.

## B.     Modification of the Trust

¶45     Michele next argues that the divorce decree modified or terminated the Agusta Trust as to the ownership of the Draper House and the Emigration Lot. Michele asserts it was "undisputed" that Ken and Sue "understood that the deeds to these properties were held in trust and they stipulated to the [divorce decree,] which distributed" the Draper House and the Emigration Lot to Ken. In other words, Michele claims that Ken and Sue "knew that they were modifying the trust holding the properties because they declared the properties to be marital assets and divided them amongst themselves." We disagree. Not only did Ken and Sue lack the ability to divide ownership of the two properties belonging to an irrevocable trust, but it is also far from clear that they ever attempted to do so.

¶46     As an initial matter, we observe the obvious—the Agusta Trust was irrevocable. And "akin to assets owned by a corporation, limited liability company, or partnership, the individual assets owned by an irrevocable trust are ordinarily third-party property which cannot be divided upon divorce." *Nelson v. Nelson*, 206 So. 3d 818, 822 (Fla. Dist. Ct. App. 2016) (cleaned up); *see also Wilburn v. Wilburn*, 743 S.E.2d 734, 742 (S.C. 2013) ("[An irrevocable] trust corpus is not the property of either spouse and thus cannot be marital property . . . ."); Brett R. Turner, *Division of Third-Party Property in Divorce Cases*, 18 J. Am. Acad. Matrim. Laws. 375, 393–94 (2003) [hereinafter *Third-Party Property*] ("If a trust is irrevocable, then it is not materially

different from a corporation. It can own property in its own name, and its existence cannot be terminated by anything short of an agreement among all beneficiaries. Thus, assets held by irrevocable trusts are not divisible property for purposes of divorce."). Put simply, no matter what Sue and Ken may have been thinking about dividing the ownership of the two properties, they could not divide property that they did not own. To use the proverbial law school metaphor of property rights comprising a "bundle of sticks," Sue and Ken could divide only the sticks they actually held, and the right-of-ownership stick was not among them because it belonged to the Agusta Trust.

¶47    Moreover, we are not persuaded by Michele's line of reasoning for the simple reason that the divorce decree did not purport or attempt to modify, amend, or terminate the Agusta Trust. Instead, the divorce decree addressed only Ken's and Sue's possessory interest in the properties, not the ownership of the properties. There is no indication that the Agusta Trust participated in the divorce action. Indeed, the divorce decree makes no mention of the Agusta Trust (or any other trust) or its trustee. Thus, what was subject to division in the divorce proceeding was the life interest of Ken and Sue in the property. And this is exactly what the divorce court divided (i.e., not the ownership of the two properties but the parties' interest in the property held by the Agusta Trust). By its own terms, the divorce decree limited itself to awarding the "property of the parties." The property of the parties—at least insofar as the Draper House and the Emigration Lot were concerned—was only Ken's and Sue's possessory interest in using the properties. Notably, the divorce decree said nothing about awarding ownership of or title to the Agusta Trust's property. Indeed, the divorce decree awarded Ken the Emigration Lot, "subject to any liability thereon," which could obviously be read to include the liability or limitation created by the Agusta Trust's ownership of the Emigration Lot. And with regard to the Draper House, the decree explicitly awarded Ken only the "interest of the parties" in that property.

¶48    The divorce court did not—and really could not—address the ownership of the properties because those properties were owned by a third party—the Agusta Trust—that was not a party to the divorce. *See* Utah Code § 30-3-5(2) ("When a decree of divorce is rendered, the court may include in the decree of divorce equitable orders relating to the children, property, debts or obligations, and parties."). "Courts can generally make a legally binding adjudication only between the parties actually joined in the action." *Hiltsley v. Ryder*, 738 P.2d 1024, 1025 (Utah 1987). In other words, "if property does not belong to either spouse, then it is not subject to division in a divorce case. Third-party property is not separate property of either spouse." *Vanderlugt v. Vanderlugt*, 429 P.3d 1269, 1273 (N.M. Ct. App. 2018) (cleaned up); *see also Guagenti v. Guagenti*, 90 N.E.3d 297, 315 (Ohio Ct. App. 2017) ("[A]n irrevocable trust . . . is an independent third-party entity[,] and . . . assets held by such a trust are not property owned by either spouse, but rather property owned by a third party, namely the trust itself and as such cannot be subject to equitable division in a divorce."); *Seggelke v. Seggelke*, 319 S.W.3d 461, 467 (Mo. Ct. App. 2010) (explaining that when a trust, rather than either of the divorcing spouses, holds title to an account, a "trial court does not have authority to award the actual account" to one of the spouses or "apportion the actual account between" the spouses); *Third-Party Property* at 378 (stating that the "general rule regarding third-party property," such as that owned by an irrevocable trust, "is simple: property owned by third parties cannot be divided upon divorce" and that "[s]ince property owned by third persons has not been acquired by a spouse, it falls outside the definition of marital property").

¶49    Michele also argues that the divorce decree served as consent to modify the Agusta Trust. She observes that under the Utah Code, a "noncharitable, irrevocable trust may be modified or terminated upon consent of the settlor and all beneficiaries, even if the modification or termination is inconsistent with a material purpose of the trust." *See* Utah Code § 75-7-411(1).

Michele further notes that the "stipulated [divorce decree] was the culmination of a 'Settlement Agreement' and was the agreement" of Ken and Sue, which she asserts fulfilled the statutory requirement of providing the "consent of the settlor and all beneficiaries," *see id.*, necessary to modify the Agusta Trust. Since Sue was a beneficiary, and Ken and Sue together were guardians of their minor children, Michele asserts that the interests of all the beneficiaries were represented.

¶50    Michele's consent argument is unpersuasive for the same reason that her other modification argument falls flat. *See supra* ¶ 47. There simply is no indication that the divorce decree contemplated dividing the corpus of the Agusta Trust. As mentioned, the divorce decree does not refer to any trust or trustee. Nor does it touch on providing "consent" to modify any property arrangement.[13] If Ken and Sue intended the divorce decree to modify the terms of an irrevocable trust, we think there would have been at least some mention of it. There are several explanations for the absence of mention of consent. Perhaps Ken and Sue forgot about the Agusta Trust at the time of the divorce. Or maybe they were aware of it and chose to ignore its restrictions. In either case, we are reticent to infer from this silence implied consent to modify an irrevocable trust. A more likely explanation is that Ken and Sue were aware of the trust, acted in conformity with its provisions, and carefully chose language that limited the disposition of the two properties to the possessory interest they enjoyed.

¶51    In sum, we detect no error in the district court's summary judgment determination that the divorce decree did not modify the terms of the Agusta Trust.

---

13. The divorce decree mentions consent only once, stating that Ken "consented to entry" of the decree on Sue's complaint for divorce.

II. Estoppel

¶52    Michele argues that the district court erred in entering summary judgment against her claim that the Agusta Trust was estopped from repudiating the terms of the 2006 Instruction. Specifically, she asserts that the 2006 Instruction provided her "a five-year tenancy" in the Draper House and "title to" the Emigration Lot.

¶53    A claim of equitable estoppel requires proof of three elements: "first, a statement, admission, act, or failure to act by one party inconsistent with a claim later asserted; next, reasonable action or inaction by the other party taken or not taken on the basis of the first party's statement, admission, act or failure to act; and, third, injury to the second party that would result from allowing the first party to contradict or repudiate such statement, admission, act, or failure to act." *Youngblood v. Auto-Owners Ins. Co.*, 2007 UT 28, ¶ 14, 158 P.3d 1088 (cleaned up).

¶54    Michele claims that she has established all three elements. First, she asserts that Ginger's execution of the 2006 Instruction was a "statement, admission, [or] act" that was "later repudiated by delivering to Michele a five-day Notice to Quit," thus creating "a claim inconsistent with Michele's five-year tenancy." Next, Michele argues that she relied on the 2006 Instruction and Ginger's "representations to her after [Ken's] death" to stay in the Draper House. And lastly, she claims injury by the Agusta Trust's "repudiation of the express terms" of the 2006 Instruction as evidenced by the judgment "against her for unlawful detainer." Michele's equitable estoppel claim fails on the first two prongs.

¶55    First, the 2006 Instruction was the action of Ken, not Ginger.[14] Even though Ginger was aware of the contents of the

---

14. Although Ken was the Settlor of the Agusta Trust, he could not modify it, because it was irrevocable. Nor could Ken act on

(continued…)

2006 Instruction—there is no dispute that she signed it—it's nevertheless hard to see how the 2006 Instruction falls under Ginger's power as trustee when she was not the one to have given it. The 2006 Instruction clearly states that Ken wrote the document in his capacity as grantor and that it comprised "the instructions to adhere to by the trustee." The most that can be made of the 2006 Instruction—at least insofar as Ginger is concerned—is that she knew of Ken's wishes. It offers no evidence that she acted in a manner that was inconsistent with a later act.

¶56    Next—and more lethal to Michele's estoppel claim—is that it is difficult to conclude that Michele *reasonably* acted on Ginger's alleged representation. We note again that the Agusta Trust was irrevocable and could only "be modified or terminated upon consent of the settlor and all beneficiaries." *See* Utah Code § 75-7-411. While the 2006 Instruction certainly provided the consent of Ken as settlor, it in no way provided the consent of "all beneficiaries"—most notably two of the children from the first marriage who were adults by this time. And the express terms of the Agusta Trust allowed Ginger to "transfer, sell, exchange, partition, lease, mortgage, create a security interest in, pledge,

---

behalf of the Agusta Trust, because he was not the trustee. *See In re Hoopiiaina Trust*, 2006 UT 53, ¶ 30, 144 P.3d 1129 ("It is well settled that [an irrevocable] trust is a form of ownership in which the legal title to property is vested in a trustee, who has equitable duties to hold and manage it for the benefit of the beneficiaries. Once the settlor has created the trust he is no longer the owner of the trust property and has only such ability to deal with it as is expressly reserved to him in the trust instrument." (cleaned up)); *see also id.* ¶ 31 ("Because [the settlor] had no ownership interest in the trust assets and no power as trustee to dispose of the trust assets, he had no ability to revoke the trusts or transfer title to the trust properties via his will."); *Clayton v. Behle*, 565 P.2d 1132, 1133 (Utah 1977) (explaining that where a settlor "has not reserved a power of revocation," a settlor "cannot revoke [a] trust" (cleaned up)).

give options upon, or otherwise dispose of any property" held in the Agusta Trust only for "cash or other consideration." But giving effect to the 2006 Instruction would materially alter the beneficiaries' interests (namely, by removing a trust asset and giving another away for five years). In other words, Ginger could not have acted pursuant to the terms of the Agusta Trust if she had followed the 2006 Instruction because the Agusta Trust would not receive any consideration for the transfer of its assets. Thus, given (1) the statutory provision against modification absent the consent of the beneficiaries and (2) the robust language of the Agusta Trust limiting the trustee's authority, we fail to see how Michele's actions in reliance on the 2006 Instruction meet the threshold of reasonability.

¶57    For these reasons, we detect no error in the district court's conclusion that the Agusta Trust was not equitably estopped from denying Michele's five-year tenancy claim or her claim to title in the Emigration Lot.[15]

### III. Evidence of the Second Trust

¶58    Michele claims that Ken created two trusts and that the court erred in granting summary judgment when it "found that Michele failed to present admissible evidence to support the creation and existence of [the Second Trust], held that the deeds to the properties were 'clear,' dismissed as a typographical error any differences in names on the deeds, and [characterized] the [2006 Instruction and 2017 Letter] as inconsistent with [the Second Trust]." Moreover, Michele contends that the "court inappropriately weighed the evidence, failed to draw all

---

15. Michele also asks us to vacate the judgment against her for unlawful detainer. But given our resolution of the estoppel issue—along with the others—Michele did not have a valid claim to the five-year tenancy at issue here. Accordingly, the unlawful detainer judgment of the district court was proper.

reasonable inferences in favor of Michele, the non-moving party, and improperly excluded Michele's declaration testimony."

¶59 "We will affirm a grant of summary judgment only if there are no disputed issues of material fact and, with the facts and all reasonable inferences viewed in the light most favorable to the nonmoving party, the moving party is entitled to judgment as a matter of law." *Heslop v. Bear River Mutual Ins. Co.*, 2017 UT 5, ¶ 24, 390 P.3d 314 (cleaned up). But not just any disputed issue precludes the grant of summary judgment; rather there must be a "genuine issue of material fact" in play. *Id.* ¶ 19. "The word 'genuine' indicates that a district court is not required to draw every possible inference of fact, no matter how remote or improbable, in favor of the nonmoving party. Instead, it is required to draw all *reasonable* inferences in favor of the nonmoving party." *IHC Health Services, Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 19, 196 P.3d 588. Thus,

> while an appellant who is challenging a summary judgment entered against it is entitled to all favorable inferences, it is not entitled to build a case on the gossamer threads of whimsy, speculation and conjecture. In essence, the parties must submit admissible evidence to present an issue of material fact, and unsubstantiated conclusions and opinions are inadmissible.

*JENCO LC v. Perkins Coie LLP*, 2016 UT App 140, ¶ 15, 378 P.3d 131 (cleaned up).

¶60 And to establish a valid trust, (1) "the settlor must have an intent to create a presently enforceable trust," (2) "the trust property must be clearly specified and set aside," and (3) "the essential terms of the trust must be clear enough for the court to enforce the equitable duties that are the sine qua non of a trust relationship." *Sundquist v. Sundquist*, 639 P.2d 181, 183–84 (Utah 1981); *see also* Utah Code § 75-7-401(1). Considering this standard

in the summary judgment context—even in light of all the evidence that Michele offers and affording her the reasonable inferences therefrom—there is not a genuine issue of material fact as to whether Ken established the Second Trust.

A.     Michele's Declaration

¶61     "[B]are contentions, unsupported by any specification of facts in support thereof, raise no material questions of fact as will preclude the entry of summary judgment." *Massey v. Utah Power & Light*, 609 P.2d 937, 938 (Utah 1980). Michele's Declaration largely consists of such bare contentions lacking factual support. Accordingly, it doesn't create a dispute of facts necessary to support Michele's claim that Ken established the Second Trust. In her Declaration, Michele alleges that Ken created a trust instrument for the Second Trust, which he kept in a desk drawer. As to the terms of the Second Trust, she "recall[ed] that it granted [her] a five-year tenancy at the [Draper House] and ownership of [the Emigration Lot]." These are the only terms that Michele recalls being in the Second Trust.[16]

¶62     Michele's statements in her Declaration regarding the Second Trust appear to be at odds with the assertions in her complaint. In her complaint (filed around February 2019), Michele explicitly stated that the 2006 Instruction created the Second Trust: "On or about September 28, 2006, [Ken] executed a trust agreement for the [Second Trust] entitled 'Instructions for Trustee Ginger Monsen.'" Then she went on to assert that other than the 2006 Instruction, "no document purporting to govern the administration of the [Second] Trust has been discovered, and on information and belief, no other such document exists." But in her later Declaration (made in June 2020), she seems to suggest that

---

16. These terms are substantially identical to the terms contained in the 2006 Instruction, which also attempted to grant a five-year tenancy in the Draper House and ownership of the Emigration Lot to Michele.

there may have been an instrument for the Second Trust separate from the 2006 Instruction but that Michael had stolen that instrument shortly after Ken's death.[17] It is well settled that "a party's admission of fact in a pleading is normally treated as a conclusive admission that the party is not later permitted to contradict, even with evidence from other sources." *Luna v. Luna*, 2020 UT 63, ¶ 19, 474 P.3d 966 (cleaned up); *see also Baldwin v. Vantage Corp.*, 676 P.2d 413, 415 (Utah 1984) ("An admission of fact in a pleading is a judicial admission and is normally conclusive on the party making it."); *Kranendonk v. Gregory & Swapp, PLLC*, 2014 UT App 36, ¶ 23, 320 P.3d 689 ("An admission in a pleading is not generally viewed merely as the attorney's retelling of the client's out-of-court statement; rather, it is a judicial admission that is normally conclusive on the party making it." (cleaned up)), *cert. denied*, 329 P.3d 36 (Utah 2014); *Saghian v. Shemuelian*, 835 F. App'x 351, 353 (10th Cir. 2020) ("Even if the post-pleading evidence conflicts with the evidence in the pleadings, admissions in the pleadings are binding on the parties and may support summary judgment against the party making such admissions." (cleaned up)). Given Michele's explicit assertions of fact in her complaint that the 2006 Instruction was the only "document purporting to govern the administration" of the Second Trust, the district court properly concluded that Michele's seemingly inconsistent statements in her Declaration were insufficient to create a genuine issue of material fact as to whether the Second Trust instrument existed.

B.      2006 Instruction

¶63     The 2006 Instruction does not create a genuine issue of material fact due to the irrevocability of the Agusta Trust. In short,

---

17. Michele is clear in her briefing on appeal that she now contends the 2006 Instruction and the alleged instrument for the Second Trust are different documents: "While the 2006 [Instruction] was not, on its own, 'a second trust,' it was evidence of a second trust."

Ken had no power to bequeath property that he did not own. The 2006 Instruction was at most an ineffective attempt to modify an irrevocable trust, not evidence of the Second Trust. Any inference that the 2006 Instruction was evidence of the Second Trust would be unreasonable because, at the time it was executed, the property it attempted to transfer was already held by the irrevocable Agusta Trust. *See In re Hoopiiaina Trust*, 2006 UT 53, ¶ 31, 144 P.3d 1129 (explaining that upon creation of an irrevocable trust, "the beneficiaries [are] . . . vested with equitable title to the trust properties," depriving the settlor of an "ownership interest in the trust assets," "power as trustee to dispose of the trust assets," and the "ability to revoke the trust[] or transfer title to the trust properties").[18]

C.      2017 Letter

¶64     The 2017 Letter does not create a genuine issue of material fact for the same reasons as the 2006 Instruction: insofar as it attempts to transfer the properties out of the Agusta Trust, it is ineffective.

D.      Deed to the Emigration Lot

¶65     The deed to the Emigration Lot naming the alleged Second Trust creates no genuine issue of material fact. While it is true that it transferred the Emigration Lot to the "*Augusta* National Trust," which Michele contends is actually the Second Trust, there is no reason to conclude that the spelling is anything more than a scrivener's error. (Emphasis added.) Indeed, Ginger submitted testimony, via a declaration, that Ken had "asked [her] to serve as

---

18. This same reasoning is applicable to defeating Michele's claim asserted in the Declaration that there was an (allegedly stolen) instrument for the Second Trust. Even if this elusive document could somehow be produced, it would still suffer from the same infirmity as the 2006 Instruction, namely, attempting to distribute property already held in an irrevocable trust.

Trustee of only a single trust, and never asked [her to] serve as Trustee of a second or additional trust." And the fact remains that he spelled her last name in two different ways, also using two different spellings for the trust in question. "The misnomer of [an entity] generally will not be treated by the courts as material, if the identity of the [entity] is reasonably clear or can be ascertained by sufficient evidence." *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 22, 87 P.3d 734 (cleaned up). This leads to the inevitable conclusion that the two spellings of the trust name do not create a genuine issue of material fact as to whether Ken actually established two trusts; rather it points to the reasonable conclusion—supported by Ginger serving as trustee of only one trust—that Ken was an admittedly poor speller who favored the phonetic method and who established only the Agusta Trust.

¶66    Accordingly, we conclude that the district court did not err in granting summary judgment in favor of the Appellees regarding the existence of the Second Trust.

## IV. Fiduciary Duty

¶67    Michele argues that the district court erred in granting summary judgment against her claim of breach of fiduciary duty. The district court ruled that the "fiduciary duty at issue" in this case required expert testimony because the duties in question "are beyond the common understanding of an ordinary juror." But Michele asserts that her claim was not so complex that the court, in the context of a bench trial, would need expert testimony to understand it. More specifically, she argues that while some aspects of trust administration require expert testimony, the district court erred in taking a "broad brush approach" to require expert testimony to determine whether Michael violated his duty to act in accordance with the terms of the Agusta Trust. As Michele explains in her brief, she "does not dispute that expert testimony may be [required] to establish Michael's duties to administer [the Agusta Trust] 'in the interests of the beneficiaries,' 'impartially,' or as a 'prudent person' would. However, Michael's

discrete duty to act 'in accordance with [the] terms' of [the Agusta Trust] does not require expert testimony."

¶68    We affirm the district court's determination in this matter, but we do so on a different basis. *Bailey v. Bayles*, 2002 UT 58, ¶ 10, 52 P.3d 1158 ("It is well settled that an appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record, even though such ground or theory differs from that stated by the trial court to be the basis of its ruling or action . . . ." (cleaned up)). Upholding the determination that Michael did not breach his fiduciary duties is the logical consequence of our resolution of other matters in this case. The reasoning is simple and concise. Michele's breach of fiduciary duty claim was based entirely on the presumption of the existence of the Second Trust or, alternatively, that the Agusta Trust was modified by Ken's writings. *See supra* ¶ 13. As we have rejected both claims, the contention that Michael breached his fiduciary duties as trustee of the Agusta Trust fails for lack of foundation.

¶69    Moreover—and apart from the existence of the Second Trust or the modification of the Agusta Trust—Michele teed up the matter in a somewhat conflated manner in her complaint. There she asserted that

> Michael owes fiduciary duties to administer [the Agusta Trust] in accordance with its terms and purposes and the interests of the beneficiaries, to administer [the Agusta Trust] in accordance with Utah law, to administer [the Agusta Trust] solely in the interests of the beneficiaries, to act impartially in investing, managing, and distributing the property held in [the Agusta Trust], and to administer [the Agusta Trust] as a prudent person would.

¶70    Thus, the very duties that Michele concedes on appeal may require expert testimony belong to the same constellation of

duties (1) that she identified in her complaint and (2) for which she offered no expert testimony. In other words, acting in accordance with the terms of the Agusta Trust included the duties she admits fall under the expert-testimony umbrella. The distinction Michele now attempts to draw on appeal between generally acting in accordance with the terms of the Agusta Trust (not requiring expert testimony) and the other duties she identified in her complaint (likely requiring expert testimony) escapes our comprehension. These other duties constitute what it means to act in accordance with the Agusta Trust. At the very least, the difference is too subtle to be of significance in this context, where Michele represented in her complaint that Michael's duty to act in accordance with the terms of the Agusta Trust was inextricably bound up with the duties to administer the Agusta Trust in the interests of the beneficiaries, impartially, and as a prudent person.

¶71    Our caselaw says the same. "Fiduciary duties may sometimes, but will not always, implicate the type of technical matters that would lie beyond the capacity of an ordinary juror." *Gables at Sterling Village Homeowners Ass'n v. Castlewood-Sterling Village I, LLC*, 2018 UT 04, ¶ 60, 417 P.3d 95. However, "expert testimony will be required in the breach of fiduciary duty context to explain standard of care and breach issues where the average person has little understanding of the duties owed by particular trades or professions." *Id.*

¶72    Given the centrality of the Second Trust (or modification of the Agusta Trust) to Michele's breach of fiduciary duty claim and the manner in which she framed her claim—along with our caselaw—the district court properly granted summary judgment on this point.

### V. Offset Claims

¶73    On appeal, Michele argues that the court erred in refusing to join her companies to the action. She asserts that making her

prove alter ego should have been avoided because it was complex and prejudicial to her. And even though the court found Michele and her companies were alter egos, Michele says it erred when it "refused to find" that the Agusta Trust "had been unjustly enriched" by Michele's payments merely because Michele had lived in the Draper House "rent-free" from the time of her marriage to Ken. Michele argues, at the very least, that she should receive an offset of $40,000 she (or her alter ego companies) paid for expenses on the Emigration Lot because it was clear that she received no benefit from that property.

¶74   As a threshold matter, Michele's joinder argument lacks merit because of the manner in which she presented her overall offset claim to the district court. Indeed, Michele advanced the joinder argument as an alternative "if the [court was] inclined to prohibit [her] from presenting evidence of offset payment made by her alter ego companies." Subsequently, the court chose to just accept the evidence of payments under the heading of alter ego, making Michele's joinder request moot. Michele has no room to now complain that the district court acted as she explicitly advocated; in other words, any error in the court's approach to the joinder request was invited by Michele. *See State v. Winfield*, 2006 UT 4, ¶ 15, 128 P.3d 1171 ("Our invited error doctrine arises from the principle that a party cannot take advantage of an error committed at trial when that party led the trial court into committing the error."(cleaned up)).

¶75   Going to the substance of Michele's contention, the district court correctly concluded that Michele failed to show that the Agusta Trust was unjustly enriched. There was no unjust enrichment because the Agusta Trust did not receive any benefit from payments made by Michele or her alter egos. Rather, Michele was the one who received the benefit of living in the Draper House; her payments benefitted her.

¶76   Just because Michele disagrees with the district court's evaluation of the evidence on whether the Agusta Trust benefited

from her payments does not mean the district court's ruling was in error. Indeed, the "fact that there was evidence contradicting the court's finding does not make the finding clearly erroneous when sufficient evidence has been submitted that supports the court's finding." *Seamons v. Wiser*, 2020 UT App 33, ¶ 23, 462 P.3d 387; *see also Nebeker v. Orton*, 2019 UT App 23, ¶ 16, 438 P.3d 1053 ("The pill that is hard for many appellants to swallow is that if there is evidence supporting a finding, absent a legal problem—a 'fatal flaw'—with that evidence, the finding will stand, even though there is ample record evidence that would have supported contrary findings." (cleaned up)). And here, there was ample evidence supporting the court's finding that Michele—not the Agusta Trust—was the beneficiary of her payments. Michele's payments were for mortgages on the properties that had previously been lien-free. The money from these mortgages benefited Ken and Michele during their marriage. Michele was simply paying for a benefit that she had received. This means that the Agusta Trust didn't benefit from Michele's payments since it didn't receive the advantage of the money from the mortgages. In essence, all Michele did was pay back what she and Ken had borrowed from the Agusta Trust by taking out mortgages on its corpus.

¶77 So, while the Agusta Trust certainly benefited from having the mortgages paid off, that benefit was not a windfall amounting to unjust enrichment since it just gave back what had been taken. Instead of benefiting the Agusta Trust in any real sense, the payments Michele made merely eliminated the encumbrances Ken and Michele had imposed on its corpus. "It is not enough that a benefit was conferred on the defendant, rather, the enrichment to the defendant must be unjust in that the defendant received a true windfall or something for nothing." *Richards v. Brown*, 2009 UT App 315, ¶ 29, 222 P.3d 69 (cleaned up), *aff'd*, 2012 UT 14, 274 P.3d 911. The Agusta Trust did not get "something for nothing" from Michele's payments; rather, it got back what it had lost.

¶78    Regarding the $40,000 for the Emigration Lot, Michele's claim fails for inadequate briefing. She has not pointed to anywhere in the record that shows the nature of these payments, when they were made, what they paid for, or how they benefitted the Agusta Trust. The burden is on Michele to show how the Agusta Trust was unjustly enriched, and she has not carried her burden on this point. *See Kimball v. Kimball*, 2009 UT App 233, ¶ 34, 217 P.3d 733 (explaining that the burden is on the claimant to prove each element of unjust enrichment).

¶79    In sum, we detect no error in the district court's denial of the offset because the facts supported its ruling that the Agusta Trust did not receive a windfall from Michele's payments.

VI. Attorney Fees

¶80    The Appellees, having received attorney fees as the prevailing party below, are entitled to their appellate fees as the prevailing party on appeal. *See Dillon v. Southern Mgmt. Corp. Ret. Trust*, 2014 UT 14, ¶ 61, 326 P.3d 656 ("When a party is entitled to attorney fees below and prevails on appeal, that party is also entitled to fees reasonably incurred on appeal." (cleaned up)). On this point, we remand the matter for a determination of those fees.

CONCLUSION

¶81    The district court properly granted the Appellees' motion for summary judgment on each of Michele's claims. And it also properly denied Michele's offset claim.

¶82    Affirmed and attorney fees awarded.

———————